OF THE

## STATE OF MISSOURI

AT THE

OCTOBER TERM, 1913.

*(Continued from Volume 253.)*

LOUISE R. SHIPPEY, Appellant, v. KANSAS CITY.

In Banc, December 24, 1913.

1. **NEGLIGENCE: Municipal Corporation: Notice: Ordinary Care.** A municipal corporation is liable for injuries resulting from negligence in failing to repair defects, as in billboards, sidewalks, etc., when it had timely notice of, or by the use of ordinary care and watchfulness could have discovered, the defect in time to have prevented the injury.

2. ———: ———: ———: ———: **Latent Defect: Decayed Timbers.** Municipal corporations must take notice of the tendency of timber to decay, and wherever the exercise of ordinary care involves the anticipation of defects that are the natural and ordinary result of use and climatic influences, and there is neglect on the part of the proper officer to make a sufficiently frequent examination of a particular structure, a city will not be relieved from liability, although the defect may not be open and notorious.

3. ———: ———: ———: ———: ———: ———: **Billboard: Evidence: Question for Jury.** Where in an action against a city for damages for injuries resulting from a falling

Shippey v. Kansas City.

billboard, the evidence for plaintiff showed that the posts supporting the board were rotten, and that the board fell apparently by reason of such rottenness, it was for the jury to say whether ordinary care and watchfulness on the part of the city would have discovered the defect in time to prevent the injury—and this is true even though it be conceded that there was no superficial showing of decay in the supports.

4. ———: **Another Liable with City: Sec. 9801, R. S. 1909.** Section 9801, R. S. 1909, providing that no suit for negligence for which another is also liable shall proceed, against a city of over 150,000 inhabitants, unless that other be made a party, refers to actual liability and not to that merely which counsel for the city may deem liability.

5. ———: ———: ———: **Release of Other Tort-feasor.** *Semble,* but not decided, that an agreement to pursue no further others liable with a city for personal injuries, would, under Sec. 9801, R. S. 1909, bar a judgment against the city.

6. ———: **Liability for Tort: Death o1 Tortfeasor.** Until the enactment of Sec. 5438, R. S. 1909, the right of action on the case for personal injuries died with the person of the wrong-doer.

7. ———: **Lessor and Lessee: Liability for Nuisance.** The lessor is not liable for a nuisance maintained on the premises by a tenant; and a plaintiff cannot maintain an action for personal injuries against a lessor on whose premises a lessee erected the billboard which fell upon plaintiff to his injury.

8. **LEASE: Form: Possession.** Any form of expression is sufficient to create a lease if it shows an intention on the part of the lessor to part with and divest himself of the possession in favor of the lessee, and a corresponding intention on the part of the lessee to come into the possession of the premises for a determinate period of time.

9. ———: **For Billposting Purposes: Evidence.** An agreement with a billposting company by the owner of a city lot which provided for the use of the lot for billposting purposes, and showed further, (1) that the owner provided for notice to vacate; (2) that he parted with all right to use the land until after notice to vacate, and (3) that there was a provision for the payment of rent, is *held* to be a lease and not a license.

Appeal from Jackson Circuit Court.—*Hon. W. O. Thomas,* Judge.

REVERSED AND REMANDED.

*Angevine, Cubbison & Holt, Bird & Pope* and *Charles A. Stratton* for appellant.

(1) The instrument executed by appellant May 23, 1907, acknowledging receipt by her from the estate and heirs of Melville H. Hudson and of Wallace Pratt, and from Charles H. Hodge, of the sum of $200, as partial satisfaction for the injury sustained by her, and by which she agreed not to further prosecute the action against them, was not a release of the cause of action against the city, because Hudson and Pratt were dead at that time, and the cause of action did not survive against their heirs or legal representatives, and they were no longer joint tort-feasors with the city. R. S. 1909, secs. 105, 106. (2) The written instrument under which defendant Melville H. Hudson, doing business as The Kansas City Bill Posting Company, took possession of and occupied the premises of Charles H. Hodge, and erected and maintained thereon the portion of the billboard which fell and injured the plaintiff, constituted a lease of said premises, and the relation of landlord and tenant existed between them. Therefore, the defendant Charles H. Hodge, having leased his premises and delivered possession to Melville H. Hudson, had no right to re-enter until after notice as required by the lease, was not responsible for the care or maintenance of the billboard erected thereon by Melville H. Hudson, and was not liable for any nuisance committed on said premises by his said tenant, Melville H. Hudson; hence was not a joint tort-feasor with the other defendants. 1 Washburn on Real Property, sec. 619; 24 Cyc. 901; 18 Am. & Eng. Ency. Law (2 Ed.), pp. 163, 605; Boone v. Stover, 66 Mo. 430; Edmunds v. Light & Power Co., 76 Mo. App. 610; Buesching v. Gas Light Co., 73 Mo. 219, 39 Am. Rep. 503; Duetsch v. Abeles, 15 Mo. App. 398; Mayer v. Schrumpf, 111 Mo. App. 54; Franke v. St. Louis, 110 Mo. 516; Grogan v. Foundry Co., 87 Mo. 321; Pope v.

Boyle, 98 Mo. 527; Reinhardt v. Holmes, 143 Mo. App. 223. (3) Even if on May 23, 1907, Hudson and Pratt, or their legal representatives, and Hodge were joint tort-feasors with the city, still the partial settlement and agreement then made, not to further sue, is no bar to the prosecution of this action against the city, because a partial settlement may be made with one of two or more joint tort-feasors, without releasing the others, or a contract may be made with one of two or more joint tort-feasors not to sue, without barring the right to sue the others not contracted with. It is only where a full settlement of the cause of action is made with one of two or more joint tort-feasors that such settlement is a bar to an action against the other joint tort-feasors not settled with. 24 Am. & Eng. Ency. Law (2 Ed.), 293, 295; Edens v. Fletcher, 79 Kan. 139; Judd v. Walker, 158 Mo. App. 156. (4) Sec. 9801, R. S. 1909, has no application for the reason that Wallace Pratt and Charles H. Hodge, the owners of the abutting property, on which the billboard was erected, and Melville H. Hudson, who erected, owned and maintained the billboard, were made parties defendant with the city in the first instance, and when Pratt and Hudson died, whatever cause of action there may have been against them ceased to exist, and could not be revived against their heirs or legal representatives, and Hodge not being in the actual occupancy and immediate control of his property, no cause of action existed against him, and there is no responsible party left in the case but the city; besides, the city made no objection to the dismissal of the action as against its codefendants. R. S. 1909, secs. 105 and 106; Kilroy v. St. Louis, 242 Mo. 79; Donoho v. Iron Works, 75 Mo. 401. (5) Kansas City is liable for negligently permitting one of its streets to become unsafe for public travel by reason of a defective and dangerous bill board being maintained in the street, or at the sidewalk line. Blivens v. Sioux City, 85 Iowa, 346;

Langan v. Atchison, 35 Kan. 318; Lundy v. Sedalia, 162 Mo. App. 218; Kiley v. Kansas City, 69 Mo. 102; Loth v. Theatre Co., 197 Mo. 349; Franke v. St. Louis, 110 Mo. 516; Campbell v. Chillicothe, 239 Mo. 455. (6) The fall of the billboard was some evidence of its defective and dangerous character. Turner v. Haar, 144 Mo. 335.; Schraff v. Construction Co., 115 Mo. App. 157; Potter v. Borabaugh, 83 Kan. 712. (7) The testimony of Mildred Greene as to the defective condition of the billboard adjacent to the part that fell and injured the appellant, at and prior to the time it fell, is competent evidence and sufficient to warrant the jury in finding that the dangerous and defective condition of the billboard could have been discovered by the city if it had exercised reasonable care. Kuntsch v. New Haven, 83 Mo. App. 174; Buckley v. Kansas City, 95 Mo. App. 188; Miller v. Canton, 112 Mo. App. 322; Smallwood v. Tipton, 63 Mo. App. 237; Bailey v. Centerville, 78 N. W. 831; Fuller v. Jackson, 52 N. W. 1075; Weil v. Mendon, 66 N. W. 58; Long v. Davenport, 67 N. W. 717; Hall v. Austin, 75 N. W. 1121; Rodda v. Detroit, 75 N. W. 939. (8) The city must take notice of the result of ordinary climatic influences upon timbers set in the ground and exposed to the winds and weather, and of the tendency of such timber to decay. The city will not be relieved from liability, although the defect may not be open and notorious. 15 Am. & Eng. Ency. Law (2 Ed.), 481; 2 Elliott on Roads and Streets (3 Ed.), sec. 808; Furnell v. St. Paul, 20 Minn. 123; Rapho v. Moore, 68 Pa. St. 404; Medina v. Perkins, 48 Mich. 67; Miller v. Canton, 112 Mo. App. 322; Deland v. Cameron, 112 Mo. App. 704. (9) It is not essential that the proof should show glaring defects, or that the city had actual knowledge. The opportunity of knowledge stands for actual knowledge. Buckley v. Kansas City, 95 Mo. App. 188; Kuntsch v. New Haven, 83 Mo. App. 174; Smallwood v. Tipton, 63 Mo. App. 237; Franke v. St.

Louis, 110 Mo. 516; Long v. Davenport, 68 N. W. 717; Fuller v. Jackson, 52 N. W. 1075; Elliott on Roads and Streets (1 Ed.), p. 645. (10) Policemen John Torpey and William J. Cummings were officers of the city, and from their knowledge or opportunity of knowing of the dangerous and defective condition of the billboard, the jury should have had an opportunity to find that the city had actual notice through them of the dangerous and defective condition of the billboard, or that they were negligent in not discovering such dangerous and defective condition while they in the performance of their duties passed by the billboard numerous times each day and night for several years before the plaintiff was injured, and that the city was guilty of negligence in not protecting the traveling public against the injury from the billboard. Carrington v. St. Louis, 89 Mo. 209; R. S. 1899, sec. 6176; Shipley v. Bolivar, 42 Mo. 401; Franke v. St. Louis, 110 Mo. 516. (11) Every reasonable inference which can be drawn from plaintiff's evidence will be assumed to be true, despite the possibility of contradictory inferences or conflicting evidence. Clubb v. Scullin, 235 Mo. 585.

*A. F. Evans* and *Francis M. Hayward* for respondent.

(1) A city is entitled to notice, either actual or constructive, of any defect which it has not caused, making a street unsafe for travel before it can be held liable therefor. Dillon, Mun. Corp. (5 Ed.), sec. 1712; Franke v. St. Louis, 110 Mo. 516; Badgley v. St. Louis, 149 Mo. 122; Carvin v. St. Louis, 151 Mo. 334; Baustian v. Young, 152 Mo. 317; Fehlhauer v. St. Louis, 178 Mo. 635; Miller v. Kansas City, 157 Mo. App. 533. (2) There was no substantial evidence of any defect in the billboard which fell on plaintiff, either in its original construction or its existing condition when it fell, or that defendant had any actual or constructive notice thereof. The court, therefore, did not err in

directing a verdict for defendant. Powell v. Railroad, 76 Mo. 80; Oglesby v. Railroad, 177 Mo. 272; Fowler v. Elevator Co., 143 Mo. App. 422; Byerly v. Consolidated Co., 130 Mo. App. 193; Bowles v. Kansas City, 51 Mo. App. 421; Smallwood v. Tipton, 63 Mo. App. 237; Miller v. Canton, 112 Mo. App. 322; Hipsley v. Railroad, 88 Mo. 348; Ruggles v. Nevada, 63 Iowa, 185; Barrett v. Village, 87 Wis. 654. (3) Even if at the time of the accident to plaintiff there had been evidence that the uprights were rotten, such defect would have been a latent defect, which would not have imparted notice to the city, and plaintiff cannot recover. Carvin v. St. Louis, 151 Mo. 334; Baustian v. Young, 152 Mo. 317; Buckley v. Kansas City, 156 Mo. 16; Miller v. North Adams, 182 Mass. 569; Lohr v. Phillipsburgh, 156 Pa. 246; Miller v. Mullan, 104 Pac. (Idaho), 660; Hembling v. Grand Rapids, 99 Mich. 292; Indianapolis v. Ray, 97 N. E. 795. (4) (a) The execution of the instrument of May 23, 1907, whether a release or satisfaction of plaintiff's claim against Hodge, discharged all joint tort-feasors. Hubbard v. Railroad, 173 Mo. 249; Dulany v. Buffum, 173 Mo. 1; Herald Co. v. Bryan, 195 Mo. 574; 34 Cyc. 1086; 24 Am. & Eng. Ency. Law, 327; Gunther v. Lee, 45 Md. 60; Ellis v. Blitzer, 2 Ohio, 89; McBride v. Scott, 132 Mich. 176; Abb v. Railroad, 28 Wash. 428; Tompkins v. Railroad, 66 Cal. 163; Denver v. Sullivan, 21 Colo. 302; Hartigan v. Dickson, 81 Minn. 284; Goss v. Ellis, 136 Mass. 513; Leddy v. Barney, 139 Mass. 394; Seither v. Phil T. Co., 125 Pa. St. 397; Ducey v. Patterson, 37 Colo. 216; Ruble v. Turner, 2 H. & M. (Va.) 38; O'Shea v. Railroad, 105 Fed. 559; 34 Cyc. 1005; Strode v. St. Louis, 197 Mo. 623; Longridge v. Dorville, 5 B. & Ald. 117; Callisher v. Bischoffsheim, L. R. 5 Q. B. 449; Prout v. Pittsfield F. D., 154 Mass. 450; Grandin v. Grandin, 49 N. J. L. 508; Wehl v. Barnum, 116 N. Y. 87; Hewett v. Currier, 63 Wis. 386; Morris v. Munroe, 30 Ga. 630; Ostrander v. Scott, 161 Ill. 339; Leeson v. Anderson,

99 Mich. 247; Henson v. Gaar, 63 Minn. 44; De Ionio v. Di Brasio, 21 R. I. 208.   (b)   If the instrument of May 23, 1907, be only an agreement not to sue even then plaintiff cannot further prosecute this action, because forbidden by law so to do.  Sec. 9801, R. S. 1909; Wiggin v. St. Louis, 135 Mo. 558; Kilroy v. St. Louis, 242 Mo. 79.

ROY, C.—Plaintiff sued for damages for personal injuries.  At the close of all the evidence

**Negligence: Fall of Defective Billboard.** the court gave a peremptory instruction for defendant.  Plaintiff suffered an involuntary nonsuit, and after an unavailing motion to set it aside, has appealed.

The city, Melville H. Hudson, Wallace Pratt and Charles H. Hodge were defendants in the original suit. The petition charged that on April 20, 1905, the plaintiff was injured by the falling of the billboard which had stood on the west side of Broadway between Ninth and Tenth streets.  That the billboard was erected upon the land of Charles H. Hodge and Wallace Pratt, adjacent to and parallel with the sidewalk.  That it was erected and maintained by said Hudson.  That it was unsafe and dangerous to persons using the sidewalk because of its height and weight, and because of the fact that the uprights supporting it had become rotten, and that it was insufficiently braced.

There was the usual allegation that the defendant had notice of the defect, or by the use of ordinary care could have known of it in time to prevent the injury.

Pratt died March 18, 1907, and Hudson died April 7, 1907, and at the October term, 1907, the plaintiff dismissed the cause as to all the defendants except the city.

Thereafter the defendant filed an amended answer setting out *in haec verba* the Act of the Legislature (Laws 1901, p. 78) now section 9801, Revised Statutes 1909, which provides that whenever a city of a hun-

dred and fifty thousand or more inhabitants shall be sued on a cause of action arising from the wrongful act or negligence of another, the city may require such person to be made a party defendant, and that the suit cannot proceed until such person has been made a party. The answer contained the following: "And answering further defendant says that if plaintiff received any injuries whatever, as alleged in her petition, that the same were caused by the acts and negligence of said Melville H. Hudson and Charles H. Hodge and Wallace Pratt, that plaintiff has received full satisfaction therefor from the estate and heirs of Melville H. Hudson and of Wallace Pratt, both deceased, and from Charles H. Hodge, having received the sum from them of two hundred dollars and plaintiff having agreed not to prosecute further said action against such defendants."

The answer then pleaded in bar the act of plaintiff in agreeing not to prosecute the other defendants. The reply contained the following:

"Second: For reply to the remaining allegations in said defendant Kansas City's amended answer she states, that since the filing of original answer of defendant Kansas City, to-wit, during the months of March and April, 1907, the defendants, Melville H. Hudson and Wallace Pratt, died.

"Plaintiff admits that she received two hundred dollars from the estate of said Melville H. Hudson, deceased, but says the payment was a gratuity, as her right of action against said Hudson and against his estate, expired when he died. That her right of action against said Pratt and against his estate also expired when he died. That under the law and facts she had no right of action against defendant Charles H. Hodge; that upon investigation she discovered that the allegations in her petition as to the liability of said defendant Hodge had no foundation in fact.

''That when she received said two hundred dollars from the estate of said Hudson the representatives of said Hudson insisted on the dismissal of said cause as to the defendant Hodge; that plaintiff received no consideration whatever from·said Hodge for said receipt or dismissal, and inasmuch as plaintiff, under the facts, had no cause of action against said Hodge, she executed the following receipt and agreement and delivered it to the representatives of the estate of said Hudson, deceased.

'' 'In the Circuit Court of Jackson County, Missouri, at Kansas City, Louise R. Shippey, Plaintiff, v. Melville H. Hudson, doing business as the Kansas City Bill Posting Company, Charles H. Hodge and Wallace Pratt, Defendants.  Number 27411.

'' 'Received from the estate and heirs of Melville H. Hudson and of Wallace Pratt, both deceased, and from Charles H. Hodge of Kansas City, Missouri, two hundred dollars ($200), partial satisfaction for injuries sustained by plaintiff as described in the petition filed in the above entitled cause as payment *pro tanto* for the injuries sued for therein; plaintiff reserving the right to demand from the other defendant in said cause compensation for the balance of her claim as stated in said petition.  In consideration of said sum of two hundred dollars received as aforesaid, plaintiff hereby agrees not to further prosecute the said action against the parties above described nor to sue any of them for the said injuries claimed by her.  This receipt and agreement is not intended or made as a satisfaction of my claim for damages by reason of said injuries, but solely, and alone as an agreement not to sue or further proceed against either of the parties above named for or on account of such injuries, reserving to myself the right to further prosecute said action as to any other defendant and to sue anyone else for compensation for my injuries.

" 'Witness my hand and seal this 23d day of May, 1907.

" ' (Signed) LOUISE R. SHIPPEY, (Seal).
" 'Witness: (Signed) M. L. ALDEN.' "

The billboard was about a hundred and fifty or two hundred feet long and ten or twelve feet high. It was constructed of yellow pine. The posts were four inches square, eight feet apart, set in the retaining wall which was of variable height ranging from four to eight feet, the lot being that much lower than the sidewalk. The board was braced by two-by-four stuff nailed to the board and to stakes driven or sunk into the ground on the west. The north end of the board, including the part which fell, was built in 1900. Hodge owned the land on which the north forty-eight feet of the board stood, and Pratt owned the next lot south. The south part of the billboard stood on the site of the old Coates Opera House, which, as the evidence tended to show, was destroyed by fire in 1904. So that, as far as the evidence indicates, the north part of the board was the oldest. The north thirty-two feet, under a high gusty wind, fell down upon the plaintiff, injuring her seriously. Though the wind was high and gusty it was no more than could be reasonably expected, as was shown by the weather bureau, it being about thirty-six miles an hour. The next sixteen feet fell partly down.

Mildred Green was a witness for the plaintiff. She was a saleslady in a store just across Broadway from the place of the accident. In coming to her place of employment she usually passed by the billboard. She testified:

"Q. About what time of day was it when those boards fell? A. It must have been between one and a quarter after.

"Q. In the afternoon? A. Yes, sir.

"Q. Had you noticed the condition of those billboards at any time prior to the time when they fell?

A. Yes, I had a number of times, and especially when I came down the street myself on that day.

"Q. You may state what you observed as to the condition of those billboards prior to the time on which they fell, either on the day on which they fell or at any time prior thereto. A. Well, I noticed that a number of the boards were loose and that the props were very rotten.

"Q. What, if anything, had you noticed about the condition of those boards as to shaking or otherwise at any time prior to the time when they fell, either on that day or on any prior day? A. Well, when the wind blew, they would sway back and forth, they were very unsteady, I know that.

"Q. How often had you noticed that condition about the billboards swaying back and forth? A. Well, at any time when there was a slight wind blowing.

"Q. You may state whether you had noticed that condition more than once prior to the day on which they fell? A. Yes, I had.

"Q. Did you go home to lunch at noon on the day on which the boards fell? A. Yes.

"Q. You may state about how you returned to your place of business, as to whether you passed those billboards at that time or not. A. Well, I came down on that side of the street part way, and noticed from their condition their swaying and all, . . . and I crossed the street—and crossed the street to the opposite side.

"Q. How close did you come to those billboards on the side of the street on which they were located at that time, before you started to cross the street? A. Well, I just walked down—the boards were located right at the edge of the sidewalk and I came down the edge of the sidewalk.

"Q. You have stated that you crossed the street instead of passing the billboards at that time. Now, where, with reference to the south end of the bill-

boards, was it that you started across the street? A. Well, I suppose I came half way down the length of those boards before I crossed the street; I started down past them.

"Q. And it was while you were passing the boards that you noticed them swaying? A. And crossed the street.

"Q. What was the condition of those billboards at the time when you did leave the sidewalk and start across the street as to whether they were standing firm or as to whether they were swaying or what their condition was? A. They were swaying; part of them were loose.

"Q. You say some of the boards were loose? A. Yes, sir.

"Q. Now, describe what boards you speak of that were loose? A. Well, I noticed particularly at the bottom some were loose, and that some were missing.

"Q. Was the ground where those billboards were located level with the sidewalk or was it below the sidewalk? A. It was below; I suppose from nine to ten feet; something like that.

"Q. You may state whether or not it was located where the Coates Opera House formerly stood? A. Yes.

"Q. Now, what kind of timbers were those billboards constructed of? A. Well, the supports were just—they were not large.

"Q. You may state what they were constructed of, and whether all lumber or other material. A. Lumber.

"Q. Can you describe what kind of lumber it was, that is as to the size of it—how large the timbers upon which the boards were nailed or fastened were? A. Well, just about the same as they use these studdings in houses, I guess; I don't know what the dimensions would be.

"Q. Were they about two inches by four? A. Two inches by four, or something like that.

"Q. How did those pieces of timber that you have described as about like the studdings in houses situated—did they stand on end or did they lay parallel with the surface of the earth? A. Well, those supporting the boards stood on end.

"Q. And were those pieces that you have described as about the size of a studding that stood on end? A. Yes, sir.

"Q. Now, what was the condition of those pieces at that time, as being sound or unsound? A. I noticed some that supported, that went to the ground, that were rotted off, entirely off.

. . . . . . . . . .

"Q. Did you at that time look at those upright pieces, or the pieces that had been upright pieces, to see what their condition was? A. Yes, sir.

"Q. What was their condition? A. I noticed that the props were rotten.

"Q. You may state whether they were all rotten or only part of them rotten or about what their condition was, as near as you can tell from the examination you made of them at that time? A. Part of them were rotten.

"Q. And you state about how many of them were rotten. A. I don't know.

"Q. Do you know about how many there were of those uprights altogether supporting that billboard? A. No.

"Q. Well, there were more than one, I suppose, were there? A. Yes.

"Q. Could you give us an estimate of about how many, if you have any recollection of it? A. No, I couldn't.

"Q. Do you know how far apart those props were? A. Well, they were some distance.

"Q. When you speak of props, do you mean the pieces that were upright and upon which the boards were nailed? A. Those and the others too; the other supports.

"Q. In what directions were those other supports? A. They ran diagonally toward the ground, from the boards to the ground.

"Q. Now, when you speak of props, you mean the uprights and the diagonal pieces too? A. Yes, sir.

"Q. You may state whether or not when you speak about the props being rotten you have reference to the upright pieces as well as the diagonal pieces. A. The diagonal pieces were pieces nailed together.

"Q. And you may state whether or not some of those pieces were also rotten. A. They were supported by others driven in the ground, which were rotten."

On cross-examination she testified:

"Q. And you spoke of examining the condition of the billboards, when was that? A. I noticed them when they fell on her, that is, when I went over to her, because she lay on the sidewalk quite a while.

"Q. So you didn't make any examination of them after that? A. No, not myself; the gentleman from the store went across and looked at that.

"Q. Who was that? A. Mr. Russell, I believe, or Mr. Burns.

"Q. Had you made an examination of them before they fell? A. Myself?

"Q. Yes. A. Not those; I noticed the others when I came down the street.

"Q. So this testimony that you have given about what you had noticed before the boards fell related to the billboards further south than those that fell? A. Yes, they were all constructed the same, though.

"Q. And you had not made any examination of this section of the boards which fell before the accident occurred? A. No.

"Q. And you didn't know what the condition was, did you? A. Well, no. I noticed they were all in the same condition.

"Q. You had not examined the north end of them? A. No.

"Q. So it was simply a conclusion of yours, not based on what you actually saw of these particular boards that made you think they were all in the same condition? A. No, I noticed them at the time of the accident; the men remarked about them; and I noticed them myself.

"Q. But I am speaking of before the accident? A. No."

The defendant read in evidence the following document:

"CONTRACT.

"Kansas City, Kans., Mar. 3rd, 1903.
"Kansas City Bill Posting Company,
    "Kansas City, Mo.,
"Gentlemen:

"Confirming the conversation I had with your Mr. Lon Hudson, I accept your proposition for the use of my Broadway and Ninth street property for bill posting purposes at the rate of:

"$24.00 per year for the Broadway lot.

"$26.00 per year for the Ninth Street lots.

"This rate to cover the period you have occupied the space on these lots since my ownership, which on the Broadway property dates from Mch. 1, 1901; Ninth Street from July, 1902. I have already given you the dates on which I acquired the property and you can send me a check for the two years' rent on the Broadway property ending Febry., and also on the Ninth Street property up to the same date so that the rent of both properties will commence from the same date in February, 1903. I am to give you five days'

notice to vacate the property should at any time I wish
to use it for other purposes.

"Yours truly,

"C. H. HODGE."

Joseph Evans, an employee of the billboard peo-
ple and whose business it was to construct and repair
the billboards, went to the place shortly after the ac-
cident, and testified for defendant as follows:

"Q. Well, what was the condition after the acci-
dent? A. Do you mean in the way of rotten or not?

"Q. Well, what was the condition of the posts,
sound or unsound or what? A. They were somewhat
weatherbeaten; they were not exactly rotten but some-
what weatherbeaten, though.

"Q. Well, how were the posts, broken off short
or splintered, or how were they? A. There were two
that was splintered, and one broken off, with the ex-
ception of one that did not fall at the end of the forty-
eight feet."

He also testified:

"Q. Now, you did not use any of that lumber to
put the billboard back there? A. I fastened onto the
post that was standing there.

"Q. Is that the only one that you used? A. And
the two that were splintered as well as I remember, I
fastened onto to put it back.

"Q. Use any more lumber there was there? A.
No, I believe not.

"Q. Threw it over in the hole and left it there?
A. Well, I hauled it away, yes, sir.

"Q. How many were broken that you saw? A.
There were four broken and two splintered, as well as
I remember.

"Q. There were two splintered? A. Yes, sir.

"Q. In the forty-eight feet? A. Yes, sir.

"Q. Now, those that were splintered, were they weatherbeaten posts? A. Yes, sir.

"Q. Did you see any of them that had come up out of the wall or the dirt there without having been broken off? A. No, sir."

James F. Campbell, another such employee, was with Evans, and testified for defendant:

"Q. Did you examine after the accident as to whether any of the posts—uprights—were broken? A. Well, I think there was one post standing, but the others were broken off.

"Q. Well, how were they broken? Were they splintered, or how? In what way? Were they straight breaks or how was it? A. Well, as well as I recollect it, they were just broke—right broke off."

A policeman passed along the sidewalk by the billboard every two hours prior to the accident.

The evidence shows that the land of Hodge on which the billboard stood was vacant and unused property, except that the billboard was maintained thereon.

## OPINION.

I. The respondent claims that there was no actual or constructive notice to the city of any defect in the billboard, and that the peremptory instruction for defendant was properly given. Reliance is placed on Baustian v. Young and the City of St. Louis, 152 Mo. 317. We quote from page 326, as follows:

*Municipal Corporation: Notice: Ordinary Care.*

"The plaintiff's testimony illustrated by his photographs tends to show that the sidewalk was out of repair both in respect to the decayed condition of the wood, and a washing out of the ground underneath; that it was really the hollow in the ground that permitted the plank to go down. There is no testimony tending to show actual notice to the city of the condi-

tion of the sidewalk and no testimony tending to show how long it had remained in that condition unless as contended by respondent the nature of the defect implies that it had existed for a considerable time. Common experience tells us that it takes time for a wooden structure exposed to the weather in this climate to decay; but that time is so indefinite and subject to so many influences either advancing or retarding the process of decay, that no reasonable calculation of it can be made in a case like this. Besides, the testimony of plaintiff shows that the real cause of the yielding of the plank under the plaintiff's weight was a hollow beneath, caused by the ground being washed out; when that occurred is not shown. That the defect was not so obvious as to impute notice, is shown by the plaintiff's testimony. The plaintiff himself had passed along the road frequently, about the time, not over the sidewalk but in the road; and had never observed any such condition, and the five witnesses for defendant used the sidewalk daily several times and did not observe it. The evidence fails to show any knowledge on the part of the city or any circumstance from which notice could be implied, or that the city had neglected a reasonable opportunity to repair the defect. Under such evidence there could have been no verdict for the plaintiff.''

We make such extensive quotation for the purpose of showing that what was said in that case on the question of the liability of wood to decay was *obiter,* and is not binding as an authority.

In Buckley v. Kansas City, 156 Mo. 16, the injury was caused by the fact that there was a break in the iron framework supporting the sidewalk at the time of and previous to the injury, and which caused the sidewalk to give way. The court said, l. c. 26:

''If all that plaintiff contends for, that the city must use reasonable care as to inspection and must take notice of the usual and natural wear and decay

of the materials composing a sidewalk be conceded, still there is in this case a complete lack of facts or evidence to which such rules of law could be applied, for it nowhere appears that ten years is the usual or natural life or period of duration or safety of sidewalks like this, nor within what period of time danger is to be apprehended from wear and decay. In the absence of such a showing it cannot be said as a matter of law that the city was guilty of negligence when there were no facts proved which showed negligence and no circumstances in the case from which negligence could be fairly implied.''

We call attention to the fact that the cause of the trouble in that case was not decay, but a *break* not shown to be caused by decay. If there is a single case in this State authoritatively holding that it is not the duty of a municipality to take notice of the tendency of timber (or any other substance) to decay, we have not found it.

The usual instruction given in cases for negligence in failure to repair holds the city liable for a defect when it had timely notice *or by the use of ordinary care and watchfulness* could have discovered

Latent Defect.

it in time to prevent the injury. [Carrington v. St. Louis, 89 Mo. l. c. 212; Fehlhauer v. St. Louis, 178 Mo. l. c. 649.]

''Municipal corporations must take notice of the tendency of timber to decay, and wherever the exercise of ordinary care involves the anticipation of defects that are the natural and ordinary result of use and climatic influences, and there is neglect on the part of the proper officer to make a sufficiently frequent examination of a particular structure, a city will not be relieved from liability, although the defect may not be open and notorious.'' [2 Elliott on Roads and Streets (3 Ed.), sec. 808.]

''The 'care, supervision and control' of a sidewalk being imposed upon defendant, no argument is needed

to establish the proposition, that such care and supervision require notice to be taken of the certain tendency of wood sidewalks to decay. This tendency is the result of natural causes, whose operation is so constant, familiar and common as to be known to everybody. To call that care and supervision which did not take into account this tendency to decay would be a contradiction in terms. Such care and supervision would be a positive neglect of legal duty." [Furnell v. City of St. Paul, 20 Minn. 1. c. 123.]

"Therefore, when a bridge is old, having stood for the length of time the timbers composing it are accustomed to last, and when it may be reasonably expected that decay has set in, it is negligent to omit all proper precautions to ascertain its true condition. Nor will mere appearance in such a case excuse the neglect." [Rapho v. Moore, 68 Pa. St. 404, 1. c. 408.]

"Where an exercise of ordinary care on its part involves the anticipation of defects that are the natural and legitimate result of use and climatic influences, a neglect of the proper officer to make a sufficiently frequent and careful examination of a particular structure is sometimes held to charge the city with constructive notice, even though the defect be latent. Illustrating this kind of constructive notice, are such cases as Furnell v. City, 20 Minn. 117; and Rapho v. Moore, 68 Pa. St. 404." [City of Denver v. Dean, 10 Colo. 375.]

"On the other hand a defect may exist and be unknown and the town still be liable on the ground that the prime fault consists in being ignorant; it being a clear principle that a want of knowledge may in given circumstances imply a want of due care. The general duty of a township is to exercise through its officers a reasonable supervision over its ways and bridges, and within fairly practicable limits to be watchful of their condition and trustworthiness and see that they are kept in a reasonably safe condition for public

travel. Its officers may not ignore the dictates of common sense and the lessons of ordinary experience and refuse to see or refuse to heed what others see and others understand. When it is generally known that a bridge has become decrepit, or when a bridge has stood so long that there is much suspicion of it, the officers of the township may not disregard the warning conveyed by these circumstances and think to excuse their neglect to take action on the ground of having had no actual notice of a dangerous infirmity. In all these cases what is finally required is the exercise of ordinary care and diligence, neither more nor less." [Medina v. Perkins, 48 Mich. 67 (71).]

We hold that, conceding there was no superficial showing of rottenness in the parts supporting the billboard, still the evidence for the plaintiff showing that said posts were rotten and that the board fell apparently by reason of such rottenness, it was for the jury to say whether ordinary care and watchfulness on the part of the city would have discovered the defect in time to prevent the injury.

Evidence.

This court would, perhaps, be justified in taking judicial notice that wood is most prone to decay just at the line of entrance into the ground. It would be no straining of the doctrine to presume that the city officers know such fact. Everybody else knows it, and why shouldn't they? There is the same tendency in a lesser degree at the unsheltered point of contact between two timbers such as the stakes and the braces, especially when they are held together by nails. The front surface of the board, the apparent, patent and visible part, is the least subject to the gnawing teeth of the elements. Has the city the right to merely look at such front surface and say "I see nothing wrong" until the supports are rotted off and the structure falls? To so hold would be to declare that it is not required to use ordinary care. It is vain to say that there is no evidence in the case as to how long it takes such timbers

to decay. The fact that they *did* decay is some evidence on that point.

We have not overlooked the fact that the evidence tends strongly to show actual notice to the city. The evidence for the plaintiff showed that the billboard swayed in the wind, and some of the timbers were observed to be rotten. Some of the boards were loose, and some were off. Defendants' witnesses testified that in reconstructing the billboard three pieces of the old timber were used and the balance hauled away. A policeman passed the billboard on the sidewalk every two hours.

The rule of liability for negligence in cases such as this is the same as for defects in the sidewalk itself. That rule requires the city to exercise ordinary care.

II. Without deciding the point, we are inclined to hold that the instrument by which plaintiff agreed not to further pursue the other defendants would bar her under section 9801, Revised Statutes 1909, from any judgment against the city if it had been a fact that any cause of action then existed against any of the other defendants. But no such cause of action existed at that time. Hudson and Pratt died in March and April, 1907. The right of action in cases for personal injury died with the person of the wrongdoer under the common law and under the express provisions of section 106 of the Revised Statutes. Section 5438 which was enacted in 1907 changing the rule in that respect did not go into effect until after the deaths of Hudson and Pratt, hence, does not apply.

The question then remains, did the agreement not to further proceed against Hodge, the owner of the

property, debar the plaintiff from proceeding against the city? We say no, for the reason that Hodge was the landlord only, and was not in possession of the property. We have been somewhat troubled over the question as to whether the contract between Hodge and Hudson was a lease or a mere license. We have concluded that it was a lease. 1 Washburn, Real Prop., sec. 619, says:

**Lease.**

"In respect to the proper terms by which an estate for years may be created, any form of expression is sufficient if it shows an intention on the part of the lessor to part with and divest himself of the possession in favor of the lessee, and a corresponding intention on the part of the lessee to come into the possession of the premises for a determinate period of time."

"To make a good lease, and thus create the relation of landlord and tenant, no particular words are necessary, but it is indispensable that it should appear to have been the intention of one party to dispossess himself of the premises, and of the other to enter and occupy as the former himself had the right to do pursuant to the agreement between them." [24 Cyc. 901.]

The contract between Hodge and Hudson provided that the land was to be used for billposting purposes. That would not of itself constitute a lease. But there are three things which mark the contract as a lease. It provides for a notice to vacate. That implies that Hudson was to have possession. Such notice was to be given in case Hodge wanted to use the land for other purposes. In the second place a mere license implies that the licensor can use the land in any way not inconsistent with the license. But here it was clearly shown that Hodge parted with all right to use the land until after notice to vacate. Third, the parties in so many words provided for the payment of rent. The use of that term did not of itself make it a lease. But

the whole instrument taken together constitutes a lease and not a mere license.

The owner of property in possession is responsible in cases of this kind. [Franke v. St. Louis, 110 Mo. 516.] But the lessor is not liable **Nuisance:** for a nuisance created or maintained on **Liability of Lessee.** the premises by a tenant. [Grogan v. Broadway Fdy. Co., 87 Mo. 321; Pope v. Boyle, 98 Mo. 527; Reinhardt v. Holmes, 143 Mo. App. l. c. 223.]

The plaintiff at the time of the receipt of the two hundred dollars and of the agreement not to pursue the other defendants, had no cause of action against any one of those other defendants, so that such agreement was harmless so far as the city is concerned, and was not to the prejudice of the city in any way. The judgment is reversed and the cause remanded for a new trial.

PER CURIAM IN BANC.—This cause coming into Banc from Division Two on the dissent of *Faris, J.,* to the opinion of Commissioner Roy, was reheard in Banc, and the opinion of Commissioner Roy was adopted. *Brown* and *Walker, JJ.,* concur. *Woodson, J.,* concurs in separate opinion; *Lamm, C. J.,* and *Bond, J.,* concur in result. *Faris, J.,* dissents—*Graves, J.,* dissents for the reason that plaintiff has barred herself by settling with one of the joint tort-feasors.

CONCURRING OPINION.

WOODSON, J.—I fully concur in the opinion written in this cause by our learned Commissioner Roy, but in doing so I wish to add the following remarks:

(a) It is earnestly insisted by counsel for respondent that there is no evidence preserved in this record which tends to show that the city knew or by the exercise of ordinary care could have known of the decayed and dangerous condition of that part of the billboard which fell and injured the appellant.

I am unable to lend my concurrence to this insistence in full. For the sake of argument only, we may concede that there was no evidence tending to show the city had actual notice of said dangerous condition; but in the face of this record it seems to me that it cannot be truthfully said that the record is devoid of all evidence from which a jury might not have reasonably drawn the inference that the city could have known of such condition had it exercised ordinary care in that regard. For instance, it is conceded, or rather not disputed, that the entire billboard, some two hundred feet in length and from ten to twelve feet in height, was a unit, that is, it was all constructed at the same time, of the same materials, and was a continuous structure; that certain portions thereof were decayed, weak and oscillated in the wind; that certain boards were loose and others entirely removed, which, taken in connection with the space between the surface of the earth and the lower ends of the boards, exposed to view the decayed condition of the posts which supported the billboard; that said condition continued for several months prior to the injury complained of, and that the witnesses for the appellant saw and observed those conditions for several months prior thereto.

But notwithstanding that evidence counsel insist that the evidence further shows that the defective places mentioned were not in that portion of the structure which fell and injured the appellant, but were a hundred or more feet removed therefrom, and, therefore, were no evidence of the fact that the structure was rotten at other places, and especially at the point where the appellant was injured.

In answer to that insistence it may be said: Suppose it be admitted, which the demurrer to the evidence does, that the city knew all of the facts stated and that it had only inspected those defects and had them repaired, but had not looked for others in the same structure composed of like materials, located in the imme-

diate vicinity, but in a more unfavorable position, because of being located in the basement and on the wall of the basement of a destroyed building, which all know from common observation and experience retains moisture longer than the adjacent elevated ground, and which is highly conducive to the decay of timbers, and especially of yellow pine, the material of which this billboard was constructed, would it be seriously contended that the city had performed its full duty to the traveling public passing along the street in question? I think not; for the reason that the city must have known that the same causes which produced the decay at the places indicated, would also in all probability have caused the same defects to exist in the structure at the point where the appellant was injured, especially when that point was more exposed to the unfavorable elements than were the points where the supposed inspection had been made.

(b) Again, it is insisted that there is no evidence tending to show that the decayed posts were weakened or in any manner contributed to the cause of the fall of the billboard which struck and injured the appellant.

This insistence is wholly untenable, because the evidence shows that the structure fell at that particular point, and it would be idle to say that the billboard would have fallen, even though those posts had not broken, as described in the evidence.

The evidence wholly fails to show that any other portion of the structure broke or gave way in a manner that did or could have caused the billboard to have fallen.

I therefore, as previously stated, concur in the opinion written by Commissioner Roy and that the judgment be reversed and the cause remanded to the circuit court for another trial. *Walker, J.,* concurs herein.