## R. L. PICKETT, Respondent, v. J. A. WREN, Appellant.

**Kansas City Court of Appeals, February 1, 1915.**

1. **FRAUD AND DECEIT: Partnership: Damages: Drug Stock.** Where parties agree to become equal partners in the purchase and operation of a drug store, and that each will contribute $900 to the capital stock of the partnership to be used in the purchase, the plaintiff paying his share and defendant pretending to pay his share, but in fact pays nothing, all being done before defendant (who was acting for the partnership) purchased the stock, the confidential relations of a complete partnership were established, and there can be no ground in law or morals on which defendant may be allowed to found a claim that he is entitled to enjoy a secret profit he procured for himself in the purchase.

2. ——: **Damages: Measure of.** Where a vendor agrees to sell property, or an interest therein, at what it cost him and fraudulently misrepresents the cost, the measure of the purchaser's damages is generally the difference between the actual and represented value.

3. ——: **Contracts: Partnership.** Where one discovers a fraud he is not required to rescind the contract under the terms of which he was fraudulently induced to pay more to the partnership capital than such terms required. He could stand on that contract and enforce against defendant the right it gave him to contribtue no more than one-half the actual cost of the stock.

4. ——: **Joint Tort-Feasors.** A mere contract not to sue, which is not the legal equivalent of a release, does not have the effect of releasing any other of the tort-feasors.

Appeal from Calloway Circuit Court.—*Hon. D. H. Harris,* Judge.

AFFIRMED.

*E. A. Shannon* and *A. C. Whitson* for appellant.

*N. T. Cave* and *Fry & Rodgers* for respondent.

JONHSON, J.—This is an action for fraud and deceit. After filing his petition plaintiff had C. R. Gibbs made a party defendant but later dismissed the action as to him and the trial proceeded against the original defendant. Verdict and judgment were for plaintiff and defendant appealed.

The parties engaged as partners in the retail drug business in Mexico and the present controversy grew out of the alleged discovery by plaintiff that his partner had defrauded him in the purchase of the stock with which they began business. At the time of this purchase defendant, a physician, had been operating a retail drug store in Mexico and was an experienced druggist, acquainted with the values of such merchandise. Plaintiff had been a farmer and then a liveryman and had had no experience in the drug business. At a time when he was out of employment defendant approached him and inquired if he would like to go into business, and being answered in the affirmative, stated that he knew of a drug stock in the nearby town of Auxvasse that they could buy and offered to go into partnership with him in the purchase of the stock and in the operation of another retail drug store in Mexico. He said, so plaintiff testified, ''We can buy that drug store and move it to Mexico, rent a building on the southwest corner of the square and make a good profit on it. . . . We won't hire any druggist. I will put my certificate over there and after we get the drug store started you can sell tobacco and cigars, and if you get any prescriptions you can 'phone over and we or Mr. Miller will come and attend to it. Mr. Miller has his diploma in my store and I can move mine or his over to the partnership store. He said I could go ahead

and run the store and draw a salary and when the business would justify us in hiring a druggist we could do so.''

The stock at Auxvasse belonged to Gordon Craighead but was in the possession of Meyers, Conley & Smith of Columbia under a chattel mortgage executed to them by Craighead to secure a loan of $1500. Gibbs, a traveling salesman for a wholesale house, appeared in the transaction as the agent of the mortgagees and was present at a subsequent meeting between plaintiff and defendant. In answer to plaintiff's question ''What do you want for this drug store?'' Gibbs said, ''Well, they ask $2000 for it but I will sell it to you and the doctor (defendant) for $1800.'' Defendant said, ''All right, let's buy it now.'' Plaintiff replied, ''Well, if I am going to buy it I might as well buy it now because I don't know anything about drugs but I would like to see the bulk of it.'' The three went to Auxvasse the next day in an automobile and looked at the stock. After their return to Mexico plaintiff, in response to defendant's urging that they buy the stock, said, ''I don't know anything about the business and maybe I am doing something I ought not to do, but if it is worth $900 to Doctor Wren, it is worth $900 to me, and it must be worth the money or Doctor Wren would not want to buy it. All right, Doc, we will buy it.'' Thereupon plaintiff and defendant each wrote and signed a check on his bank for $900, and delivered it to Gibbs as the agent of the mortgagees.

At the time this was done defendant had agreed with the mortgagees to purchase the stock for $600. But when defendant sought to complete the purchase the mortgagor refused to agree to it and the mortgagees were compelled to sell under the provisions of the mortgage before they could convey the title. Defendant informed plaintiff of this unexpected cause of delay and plaintiff agreed to wait. After waiting

sometime plaintiff becoming impatient saw defendant and said "those fellows have got our money and we haven't a thing to show for it. Let's go to Columbia and have some understanding about our store." Defendant agreed to the proposal but upon their arrival there told plaintiff to wait at a certain restaurant until he could go and see one of the mortgagees and "see if he couldn't get a written guarantee that we would get our store for eighteen hundred dollars." Plaintiff waited. In about an hour defendant came to the restaurant and reported that he had seen the mortgagee who said "We cannot get Craighead (mortgagor) to release the stock and we will have to sell it under the mortgage; we will not give you a written guaranty but my word is good and I will guarantee that you fellows get the stock of goods at what you paid for it." It appears that Gibbs had secretly returned defendant's check of $900 to him but had cashed plaintiff's check and with the proceeds paid the mortgagees the agreed purchase price of $600, gave defendant half of the remainder and kept the other half as his own share of the profit. The stock was sold under the mortgage and was struck off to defendant who bid $600. In response to a telephone message plaintiff met defendant that evening at the store in Auxvasse and was told by defendant: "Well, I bid it in for $600. We get the store for eighteen hundred dollars, the amount we agreed to pay for it."

The stock was removed at once to Mexico and the partnership business was begun under the management of plaintiff, each partner having an equal share. After running the business five or six months, plaintiff, hearing that defendant had bought the stock for $600 instead of $1800 as represented, asked him for an explanation, and was told "that is a mistake. I gave my check for $900 just like you did, you seen me give it to Mr. Gibbs." Plaintiff investigated and, finding

that the check of defendant had not been cashed, took
a witness with him and had another interview with de-
fendant. "What did you fellows give for the drug
store?" the witness asked. "Go ahead and tell him,
Doc," plaintiff added. Defendant replied, "$1800."
The witness said, "I understand you only gave $600.'
Defendant replied, "I went over to Fulton and bid it
in for $600. That is how it got out."

Afterward defendant procured a purchaser for
plaintiff's half interest in the business at $1000, and
the partnership was dissolved. Plaintiff, while
manager, had drawn $80 from the store for living ex-
penses and in their dissolution settlement was allowed
a further credit of about $60, which, he states, was
in settlement of his salary account, but defendant
says he bestowed it on plaintiff as a gift. Defend-
ant's version of the transaction in substance is that
he first bought the stock for $600 and then sold a half
interest in it to plaintiff for $900, which was less than
its reasonable value. He denies representing that he
paid $1800. Of the circumstances of the dissolution
of the partnership he testified: "Pickett became dis-
satisfied and wanted to trade or sell out so I went to
work and got a trade for Pickett's one-half interest
but he did not like the deal. He said he did not want
to trade, but wanted to sell; I told him I could not buy
it as I was not able. Pickett wanted $1000 for his
half interest. I then went to work to get Pickett $1000
for his half interest. Just about the time I had the
trade made so Pickett would get his $1000, Mr. R. D.
Rodgers, an attorney, came into my store on the south
side of the square in Mexico. He and I walked to the
back end of the store and Rodgers said he had been
employed by Pickett and that he, Pickett, claimed I
owed him $600. I told him I did not. I also told
Rodgers that I had a trade made where I could get
Pickett $1000 for his half interest, but if he was go-

ing to kick up that way I was done and would do nothing else neither would I have anything else to do with it. Mr. Rodgers said 'Oh go ahead, go ahead and make the trade and get him out.' So I did, I made the deal and Pickett was paid $1000 for his one-half interest and stepped down and out apparently perfectly satisfied. So after the trade Bob came over to my store, came in and said, 'now, Doc, we have some bills to pay,' and I said 'all right, Bob.' He had some bills that we owed up to the wholesale houses and we figured them up and I said, 'Now, Bob, you owe me here at the store on account,' and he said 'yes,' and he said 'you owe an account to our store,' he said, 'Doctor, I haven't made much out of this and I feel like you ought to give me that,' and I said, 'Well Bob, if you feel that way, all right, I will do it,' and we settled that way. It amounted to something like $140. I think the Pickett Drug Co., owned—the Wren Pharmacy Co., owed the Pickett Drug Co., about $40 and Bob had taken out of the Pickett Drug Co. about $80. We made the settlement in the best of humor. After the settlement I set up the cigars and we sat down, smoked and talked for awhile, and Pickett left in perfectly good humor, I thought. I never knew any difference until the suit was brought against me."

After Gibbs was joined as a party defendant he made his peace with plaintiff by returning the sum of $150 he retained from the proceeds of plaintiff's check and plaintiff, by his attorneys, agreed in writing that "in consideration of the payment of $150 by C. R. Gibbs, to Fry and Rodgers, attorneys for plaintiff, it is agreed that this case, so far as C. R. Gibbs is concerned, shall be dismissed, and that the further prosecution of the same shall be against J. A. Wren."

It must be conceded that plaintiff emerged from the partnership in no worse pecuniary condition than he was in at the time he invested his money in the

purchase of the stock. He put in $900 in money and his services for six months and came out with about $1300.

The first point made by defendant for a reversal of the judgment is that plaintiff has no cause of action for fraud and deceit since he suffered no pecuniary loss (citing Thompson v. Newell, 118 Mo. App. 405; Lewis v. Land Co., 124 Mo. l. c. 688; 20 Cyc. 12; Johnson v. United Railways, 247 Mo. 326). That rule, as stated in the cited cases, applies in instances where vendor and vendee deal at arm's length as business antagonists and not as parties to a confidential relationship. A vendee who stands on equal footing with his vendor as to means of information relating to the subject of the transaction must rely upon such sources and will not be heard to complain of representations the falsity of which would have become known to him if he had exercised ordinary care and prudence. And in cases where the vendee is justified in relying upon representations of the vendor relating to material facts he can have no cause of action for deceit unless he suffered pecuniary damage thereby. The rule is well settled that in an action at law for deceit actual damages must have resulted to the plaintiff from the deception. [Thompson v. Newell, supra, and cases cited.]

But the invocation of this rule by defendant proceeds from his own version of the facts and ignores entirely the evidence of plaintiff which, being substantial, we must accept as true in our consideration of the argument that plaintiff has failed to make a case to go to the jury.

If, as defendant states, he bought a stock of drugs worth $3000 for $600, and afterwards sold an undivided half interest in it to plaintiff for $900 from which plaintiff afterward realized $1300 or $400 in excess of his outlay, and if he made no agreement to

sell plaintiff a half interest for half the sum he paid
for the whole stock, plaintiff would have no cause of
action, even if defendant, with intent to deceive, did
represent that he had paid $1800 for the stock when
he had only paid $600. But the evidence of plaintiff
tends to show that he did not stand upon an equal foot-
ing with defendant with reference to the subject of
the price at which the latter purchased the stock, that
the true fact was concealed from him and that, coupled
with an agreement that he should pay one-half of the
actual price of the stock demanded by the mortgagees,
a false and fraudulent representation that such price
was $1800 was made by defendant and relied upon by
plaintiff who had no reasonable opportunity of ascer-
taining its falsity. The rule is of general acceptation
that where a vendor agrees to sell property, or an in-
terest therein at what it cost him, and fraudulently
misrepresents the cost, the measure of the purchaser's
damages is generally the difference between the actual
and the represented value. [Pendergast v. Reed, 29
Md. 398; Crater v. Binninger, 33 N. J. L. 513; Salm v.
Israel, 74 Ia. 314; 14 Am. & Eng. Encyc. of Law, 185.]

This rule, as we said in Thompson v. Newell,
supra, applies to cases where the contract in terms
provides that the actual cost of the property to the
vendor is to control the price to be paid by the vendee.
Enforcing this rule in such cases is nothing more than
enforcing the strict letter of the contract the parties
themselves have made. Regardless of whether or not
a confidential relationship existed between the parties
plaintiff was entitled to go to the jury on the issue that
his contract with defendant was for the purchase of a
half interest for one-half of the actual cost of the
whole stock. If such were the contract plaintiff's
recoverable damages would be measured by the dif-
ference between the price the contract required plain-
tiff to pay for the half interest, i. e., $300, and the

price of $900 fraudulently extorted from him by defendant. Such measure of damages is entirely unaffected by the fact that plaintiff suffered no pecuniary loss in the transaction but came out with a profit. He is entitled to stand on his contract which provided, in substance, as we have shown, that he was to have an equal share in the bargain defendant achieved in the purchase of the stock.

To this point we have discussed the case from the viewpoint of the parties having dealt with each other as business antagonists, but we find the evidence of plaintiff presents another ground upon which he would be entitled to recover damages based upon the difference between the actual and represented costs of the stock. Before the purchase for $600 was agreed upon plaintiff was induced to and did enter into confidential relations with defendant. The understanding and agreement was that they would become equal partners in the purchase and operation of a drug store, and that each would contribute $900 to the capital of the partnership to be used in the purchase. Plaintiff paid his share and defendant pretended to pay his, but, in fact, paid nothing. All this being done before defendant (who was acting for the partnership) purchased the stock, the confidential relations of a complete partnership were established and there can be no ground in law or morals on which defendant may be allowed to found a claim that he is entitled to enjoy a secret profit he procured for himself in the purchase. He was the agent of plaintiff in that transaction as well as his own representative and plaintiff could not be rightly deprived of any part of his right as a partner to share in the full proceeds of the real bargain obtained by defendant in the prosecution of partnership business.

On discovery of the fraud plaintiff was not required to rescind the contract under the terms of

which he was fraudulently induced to pay more to the partnership capital than such terms required. He could stand on that contract and enforce against defendant the right it gave him to contribute no more than one-half the actual cost of the stock.

In selling his partnership interest in the stock and business to a third person, he did not sell or waive the claim for damages inuring to him from the deceit, and his evidence shows conclusively that such claim was not included within the terms of the settlement of his account with defendant growing out of the operation of the drug store.

The agreement between plaintiff and Gibbs, who was a joint tortfeasor with defendant under which the latter was dismissed from the action in consideration of the restoration to plaintiff of the proceeds of the fraud which he received, was not in form or substance a release of one joint tort-feasor, having the effect of releasing both (Laughlin v. Manufacturing Company, 153 Mo. App. 508; Hubbard v. Railway, 173 Mo. 256; Dulaney v. Buffum, 173 Mo. l. c. 14; Strode v. Transit Co., 197 Mo. 616; Chicago Herald Co. v. Bryan, 195 Mo. 574; Shippey v. Kansas City, 254 Mo. 1) but was a mere covenant not to sue, which is not the legal equivalent of a release and does not have the effect of releasing any of the tort-feasors. [Arnett v. Railway, 64 Mo. App. 368; McDonald v. Groc. Co., 184 Mo. App. 432.

The demurrer to the evidence was properly overruled. There is no prejudicial error in the record and the judgment is affirmed. All concur.