# BROWN *v.* DISTRICT OF COLUMBIA.*

TRIAL; DIRECTION OF VERDICT; MUNICIPAL CORPORATIONS.

1. The trial court has the right to direct a verdict for the defendant upon
   the opening statement of plaintiff's counsel to the jury.
2. Where the trial court directed a verdict for the defendant on the open-
   ing statement of plaintiff's counsel, this court, upon a review of the
   circumstances leading to such action, considered both the allegations
   of the declaration and the facts stated by counsel, in determining
   whether the lower court erred.
3. The maintenance by a municipality of a fire department is in the nature
   of a general public duty as contradistinguished from those duties pure-
   ly municipal and local; and the employees thereof are not mere agents
   or servants of the municipality, but, rather, officers charged with a
   public service.
4. The District of Columbia, as a municipality, is not liable for personal
   injuries received by a child who fell through an unguarded opening in
   the floor of an engine house, and who was in the house for the pur-
   pose of witnessing a public procession from its windows, although she
   was in the house by the express or implied invitation of her father,

---

*Municipal Corporations—Injuries Caused by Fire Department.*—The
liability of a municipality for the acts or negligence of members of its
fire department is discussed and the authorities presented, in note to
*Cunningham* v. *Seattle,* 4 L.R.A. (N.S.) 629.

a fireman, or under a general permission of the municipal authorities to the public to enter the house for such purposes. (*Citing Walter* v. *Macfarland*, 27 App. D. C. 182, and distinguishing *Roth* v. *District of Columbia*, 16 App. D. C. 323.)

No. 1697.    Submitted February 20, 1907.    Decided March 5, 1907.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia on a verdict directed by the court in an action to recover damages for personal injuries.                                        *Affirmed.*

The COURT in the opinion stated the facts as follows:

On April 13, 1901, the appellant, Golden Brown, who was an infant, through her father, John S. R. Brown, as next friend, brought this action to recover damages for personal injuries sustained on February 9, 1900, through the alleged negligence of the defendant, the District of Columbia.

The declaration is in several counts, but the gravamen of the action set out in each is substantially the same. It is stated in the following extract from one of them:

"The plaintiff, Golden Brown, an infant of the age of eleven years, by John S. B. Brown, her next friend, sues the defendant, the District of Columbia, a municipal corporation duly incorporated by an act of Congress of the United States of America, for that the defendant, before and at the time of the hereinafter-mentioned wrongs and injuries suffered by the plaintiff, owned, possessed, controlled, used, occupied, kept, and maintained a certain fire engine house or building in the city of Washington, District of Columbia, of the height of, to wit, two stories, situate on the south side of M Street Northwest, between 32d and 33d streets, and known as Engine House No. 5, the second floor or story of which said building was reached by means of a stairway from the first floor thereof; and in the front room of the said house or building on the said second story thereof was a certain room in which the defendant made and kept, and maintained for a long time, to wit, five years, to wit, two circular

holes, recesses, or openings in the said floor in the said room, each of the diameter of, to wit, 6 feet, without any guards or rails whatever around or about the same, or any other means whatever to protect those citizens and others, including the plaintiff, lawfully upon said second floor and in the said room, from great peril and injury from and by falling through the said holes, recesses, or openings to the ground or first floor beneath the same, to and of the distance of, to wit, 23 feet; and said holes, recesses, or openings were closed from beneath the same at the time hereinafter mentioned, by means of certain doors, commonly called trapdoors, so insecurely fastened and constructed that a slight weight or downward pressure thereon would cause the same to open towards the said ground or first floor, and the said doors when shut excluded the light from the entrance of each of the said holes or openings, so that their location was not easily but with difficulty discernible, and the closing of the said doors made the same holes, recesses, or openings far more dangerous to the plaintiff, the public, and others than they were when open; and for that on, to wit, the 9th day of February, A. D. 1900, the said doors to the said holes, recesses, or openings were in fact closed, and the said front windows of the said second-story front room were shaded and occupied by divers citizens in and upon the said premises, by reason of the invitation hereinafter set forth; and for that the defendant and the agents, employees, and servants of the defendant in charge of and at the said building, for a long period of time, to wit, five years, constantly, notoriously, and openly, and on, to wit, the 9th day of February, A. D. 1900, invited and permitted the members of the families of the firemen and others employed at or about the said building to come or go upon the said floor of the said front room of the said second story to there visit them; of all of which the defendant had due notice; and it became and was the duty of the defendant and of its servants, agents, and employees, in accordance with the said invitation and permission, to exercise due and reasonable care towards, and to protect from injury, the families of the said firemen and others so visiting the said room, against the said unguarded

recesses, holes, or openings; and for that the plaintiff, on, to wit, the 9th day of February, A. D. 1900, was a member of the family of one of said firemen, and was lawfully in and upon the said premises and the said floor of the said second-story front room on a visit to her father, one of said firemen, pursuant to the said invitation and permission, and on, to wit, the said 9th day of February, A. D. 1900, the plaintiff, then an infant of tender years, of, to wit, eleven years of age, while on the said floor and in the said room, and using due and reasonable care, and without any fault or negligence on her part, and without knowledge on her part that the said holes or openings were closed by means of the said trapdoors, but solely through the negligence and carelessness of the defendant and the agents, servants, and employees of the defendant in not providing any guards or rails or other protection around or about one of the said holes or circular openings, and in closing the said trapdoors thereto, was put in great peril of her life and limbs, and fell through one of the said holes, recesses, or openings to the ground or first floor beneath, a great distance, to wit, a distance of 23 feet, with great force and violence, and was severely frightened, hurt, wounded, bruised, and permanently injured."

Defendant's demurrer to the declaration was overruled February 12, 1904, and it entered a plea of the general issue. The case was called for trial by jury on April 23, 1906, and the jury having been impaneled, the counsel for the plaintiff made the following statement of his case:

"If your Honor please, and gentlemen of the jury, this is an action brought by Golden Brown, an infant, by John S. Brown, her father, for damages against the District of Columbia, and the plaintiff's case is about as follows:

"On the 9th day of February, 1900, in the afternoon of that day, Golden Brown, being about nine or ten years old, went to the engine house in Georgetown, on M Street, between 32d and 33d streets, known as Engine House No. 5, for the purpose of viewing the funeral procession of General Lawton, which was to pass that engine house that afternoon. This engine house had two stories, and on the second story of the engine house it

had been the custom of the families of the different firemen at this engine house to go whenever a parade or procession of any character was passing. Golden Brown is the daughter, as I say, of John Brown, who was employed at that time as a fireman. On that particular day Mr. Brown was off from his duties. He had been to his house, and had had his dinner, and went to the engine house, carrying two of his children there. Golden Brown, his little daughter, the plaintiff here, came home from school, and had her dinner and learned that her father, brother, and sister had gone to the engine house, and she went down there alone, and when she got to the engine house she went upstairs on the second floor or story, as she had on a number of occasions before done, and went into this room, where there were at least fifteen or twenty persons, or probably more, some of whom were members of the families of the firemen of that engine house, which faces on M Street, between 32d and 33d streets.

"In the floor of the second story of this engine house there are openings made for the purpose of permitting the firemen to go down what they call the greasy pole. It is—more than an open hole, and the pole that runs down from the second floor to the first floor, which enables the men to slide down this pole to get on the engine and go out whenever a fire occurs. In each hole there is a trapdoor arrangement that opens downwards, but stands just like this (indicating), as the evidence will show, and whenever the slightest pressure or weight is put upon this trapdoor, it, of course, opens. The hole comes right up in the center of these two doors that open in a downward manner, and they open just like that (indicating); and on this occasion, for some unaccountable reason, these doors had been left open. For some time previously, say three or four months previous to the 9th day of February, 1900, there were guard rails around these holes, put there for the purpose of keeping persons on that floor from falling into the holes. Several months, certainly three or four, before this accident happened, the District had repaired the floor on the second floor of this building, putting in new flooring. For some reason, we do not know why, these guard rails, or the chain with the little rails, were taken down and

never replaced, so that on the 9th day of February, 1900, these two circular holes or recesses were entirely unincolsed and entirely unprotected.

"It had been the custom, as I say, for a great many years, for the members of the families of the firemen to go in and upon the premises there. No objection was ever raised to it. In fact, there was an invitation extended to them, as the evidence will show, either express or implied, to come and go on that floor of the house. Golden Brown had been there many times before, and no objection was raised to her being there; and on this occasion she went there for the purpose of viewing this parade. As she went into the room on this afternoon, she saw her father over at the window, and as she walked over towards the window she fell into this recess or hole, this opening in the floor, down to the first floor of the building, a distance of 21 or 23 feet, I forget now which; either 21 or 23 feet. She was permanently hurt and injured, was unconscious for days, certainly four or five days, and suffered serious and permanent injuries, fractured her hip, and until this day one of her feet is shorter than the other, I think certainly an inch; and the evidence will show you that she walked on crutches for many months, had to stay away from school for a whole year, and suffered intense pain and agony.

"I think this is about the substance of the evidence on behalf of the plaintiff."

The court, on his own motion, thereupon asked plaintiff's attorneys if the claim to a right of recovery was based upon a statute. To which inquiry counsel for the plaintiff replied in the negative, and in reply to further inquiry then informed the court that the cause of action was based upon the theory that the District of Columbia, as the owner of the real estate and as the owner of the premises where the accident occurred, was liable upon the ground that the plaintiff was permitted, by express or implied invitation, to come and go upon the premises, and that the plaintiff was rightfully on the premises, and not a trespasser, and that it was the duty of the defendant to see to it that she did not go into danger. The plaintiff further offered to prove that

the defendant had for a number of years prior to the accident in question, either by express or implied invitation, allowed the plaintiff as well as numerous other parties to go upon the premises. Thereupon the plaintiff requested and moved the court to allow her to introduce plaintiff's evidence to prove all the allegations of the declaration, which said request was refused by the court, and objection and exception were duly taken by the plaintiff; said exception was noted on the minutes of the presiding justice.

The court, stating his reasons therefor, directed the jury to return a verdict for the defendant. Execution of this direction was suspended for a time, and the following proceedings were had:

"Mr. David: We note an exception to your Honor's ruling. We also ask that we be allowed to introduce our proof in substantiation of the allegations of the declaration.

"The Court: You do not claim to be able to prove any facts other than those stated to the jury in your opening?

"Mr. David: I think I stated substantially to the jury all the facts upon which we rely, but, furthermore, I desire also to state that Mr. Justice Barnard overruled a demurrer to this declaration.

"The Court: I am not going to enter into any consideration of the question of whether a demurrer would be good or bad. I only want to know what you state you will prove as a matter of fact.

"Mr. David: We expect to show that what we allege in the declaration is correct. I have already stated what the evidence on behalf of the plaintiff would show. I also state at this time that the record shows that Mr. Justice Barnard overruled the demurrer to the declaration.

"Mr. Douglass: In order that there may be no misunderstanding of the extent of our proof here, we now offer to prove that this hole in the floor was an exposed one, one so located that it would be exceedingly dangerous to one going into this house, and that it had been the custom there for years past to allow the children, even of tender years—

"The Court: That has already been stated.

"Mr. Douglass: And we wish to offer to prove that.

"The Court: Yes, it was a trapdoor or hole used by the firemen to enable them to get downstairs in a hurry in responding to an alarm."

The court then renewed the order to the jury, and verdict was returned in accordance therewith. From the judgment entered thereon the plaintiff has appealed.

*Mr. E. S. Douglass* and *Mr. Levi H. David* for the appellant.

*Mr. Henry P. Blair,* Assistant Corporation Counsel, for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The right of a court of the United States to direct a verdict upon the facts stated by counsel as constituting the plaintiff's case is established beyond question. *Oscanyan* v. *Winchester Repeating Arms Co.* 103 U. S. 261, 263, 26 L. ed. 539, 541. In that case a verdict was directed for the defendant upon the opening statement of the plaintiff's counsel, which contained a fact relating to the terms of the contract sued on, not disclosed in the declaration, but clearly showing the illegality of the alleged contract. In affirming the judgment, it was said: "The power of the court to act, in the disposition of a trial, upon facts conceded by counsel, is as plain as its power to act upon the evidence produced. The question in either case must be whether the facts upon which it is called to instruct the jury be clearly established. If a doubt exists as to the statement of counsel, the court will withhold its directions, as where the evidence is conflicting; and leave the matter to the determination of the jury. In the trial of a cause the admissions of counsel as to matters to be proved are constantly received and acted upon. They may dispense with proof of facts for which witnesses would otherwise be called. They may limit the demand made

or the set-off claimed. Indeed, any fact   *   *   *   admitted by counsel may be the ground of the court's procedure, equally as if established by the clearest proof. And if in the progress of a trial, either by such admission or proof, a fact is developed which must necessarily put an end to the action, the court may, upon its own motion or that of counsel, act upon it and close the case.   *   *   *   Of course, in all such proceedings, nothing should be taken, without full consideration, against the party making the statement or admission. He should be allowed to explain and qualify it, so far as the truth will permit; but if, with such explanation and qualification, it should clearly appear that there could be no recovery, the court should not hesitate to so declare and give such direction as will dispose of the action."

There was no difficulty in that case in respect of mistake, ambiguity, or want of completeness in the opening statement, which admitted a fact that discharged all possible right of recovery in the action. It was in the interest, therefore, of the speedy administration of justice, to act upon the admission when deliberately made, and avoid the delay that would be caused by the production of the evidence.

The cause of action in the case at bar differed materially in character from that in the case cited, and did not so readily admit of the statement of an independent fact, undisclosed in pleading, upon which alone the case could be made to turn. Moreover, the counsel for plaintiff, before the court took final action, stated that he wanted to prove all the allegations of the declarations. This was somewhat qualified by the last offer of counsel heretofore recited. It is to be noted, also, that counsel did not offer to withdraw, correct, or further qualify any declaration of the case stated in opening. Nor is there any perceptible conflict between the facts alleged in the declaration and those of the opening statement. The latter merely added some specific facts making clear and extending the allegations that were general.

We think it just to the appellant, under all the circumstances, to consider both the allegations of the declaration and the facts

stated by counsel, in determining whether the court erred in directing the verdict.

The District of Columbia has had long existence as a municipal corporation under acts of Congress providing for its government, and, from time to time, conferring special powers and imposing certain duties upon its executive officers; of all of which we necessarily take notice. Its municipal organization is of a peculiar character. There is no general organic law covering all of the ordinary powers usually conferred in the creation of municipal corporations in the several States,—no formal municipal charter, so to speak. There is no special municipal council or legislative body. Congress possesses all the powers of a local legislature, and is under limitations in the matter of their delegation. The commissioners are ministerial officers. Sometimes Congress enacts laws relating to strictly municipal affairs, and sometimes it delegates to the commissioners the power to enact police regulations respecting specified subjects. The commissioners have no authority to raise revenues for the support of the local government, and those raised by the direct authority of Congress are not turned over to them for appropriation and expenditure at discretion. *Walter* v. *Macfarland,* 27 App. D. C. 182, 185.

Municipal corporations in general are invested with two kinds of special powers, and charged with two kinds of duties; the one kind is private, that is to say, merely municipal and for special local purposes and benefits; the other of a political or governmental character, for the general public welfare. 2 Dill. Mun. Corp. sec. 966.

In the language of Folger, J.: "One is of that kind which arises from the grant of a special power, in the exercise of which the municipality is as a legal individual; the other is of that kind which arises or is implied from the use of political rights under the general law, in the exercise of which it is as a sovereign. * * * The former is not held by the municipality as one of the political divisions of the state; the latter is." *Maxmilian* v. *New York,* 62 N. Y. 160, 164, 20 Am. Rep. 468.

Notwithstanding the peculiar nature of the municipal organ-

ization under consideration, considerable latitude in respect of its liability for injuries resulting from negligence in the performance of its municipal duties has long been recognized. It has been held liable for a defective bridge (*Weightman* v. *Washington,* 1 Black, 39, 17 L. ed. 52) for unsafe streets (*Barnes* v. *District of Columbia,* 91 U. S. 540, 23 L. ed. 440; *District of Columbia* v. *Woodbury,* 136 U. S. 450, 34 L. ed. 472, 10 Sup. Ct. Rep. 990); and for the maintenance of a nuisance (*Roth* v. *District of Columbia,* 16 App. D. C. 323). But in no case has its liability been declared for failure to perform a general governmental duty. *Roth* v. *District of Columbia, supra,* that is strongly relied on by the appellant, enounces no such doctrine. Plaintiff in that case owned and resided in premises, adjacent to which the District of Columbia erected and maintained a stable for vehicles and horses used by the police force; and the proof was that, by reason of the manure and filth suffered to accumulate in said building, offensive and unwholesome odors emanated therefrom, and swarms of flies and other vermin were produced, which penetrated plaintiff's house, destroying her comfort, and endangering her health and that of her family. In affirming her right to recover damages for the nuisance, Mr. Justice Morris, who delivered the opinion of the court, took care to say: "In the exercise of the powers conferred by the State upon municipal organizations, the distinction between purely municipal functions and governmental duties is undoubtedly well established, with the resulting consequence that, while the municipality is held to liability in the courts of law in respect of the former, no such liability can be enforced in respect to governmental duties. * * * If it be granted that the duties of the police force are mainly, and even exclusively, public and governmental, it does not follow, upon any principle of sound reasoning, that the houses to which they resort when they are not in the performance of any such duty, or the appliances which are contained in such houses, should be permitted to become a nuisance detrimental to health. The performance of their public duties does not require the perpetration of a nuisance by them. On the contrary, the abatement of nuisances is

part of their duty, and part of the duty of the municipality; and we would regard it as an absurdity to assume that their public duties could not be performed without the commission of a nuisance."

The fire department of the District of Columbia was established by authority of Congress, and is maintained by special appropriation of money, for a. general public purpose. Houses for the keeping of engines, and horses to draw them when needed, and of other appliances, as well as for the occupation of the firemen by day and by night, were absolutely necessary, and were erected through appropriations for the particular purpose. These houses were not intended or expected to be places of public resort for entertainment or amusement. The windows therein opening upon the public streets were intended to give light for the convenient use of the houses, and not to be used as places of observation of public processions. The particular house was in no sense a nuisance or a menace to the public, either in respect of construction or maintenance. The openings in the floor of the second story, where the firemen slept or rested, were necessary parts of the construction and uses of the house, devised to give aid in the rapid equipment and despatch of the engines and other appliances, when called by fire alarm. Speedy despatch is an essential requisite of an efficient service. All modern fire-engine houses are provided with similar openings. Whether these openings were provided with guard rails at the time of the injury, or the same could have been provided and maintained without interfering with the object of their construction, is an immaterial question. The firemen, by entering the service, assumed the consequent risk. People not in the service, whether related to the firemen or not, had no right of entry and occupation; and the firemen had no authority to extend the privilege.

By the great weight of authority, the maintenance of a fire department is in the nature of a general public duty, as contradistinguished from those duties purely municipal and local; and the employees thereof are not mere agents or servants of the municipality, but, rather, officers charged with a public service.

In consequence it is held that the maxim, *Respondeat superior,* has no application. *Fisher* v. *Boston,* 104 Mass. 87, 94, 6 Am. Rep. 196; *Wilcox* v. *Chicago,* 107 Ill. 334, 47 Am. Rep. 434; *Grube* v. *St. Paul,* 34 Minn. 402, 26 N. W. 228; *Frederick* v. *Columbus,* 58 Ohio St. 538, 546, 51 N. E. 35; *Smith* v. *Rochester,* 76 N. Y. 506, 509; *Wild* v. *Paterson,* 47 N. J. L. 406, 411, 1 Atl. 490; 2 Dill. Mun. Corp. sec. 976. In some of the foregoing cases it was held that the municipality was not liable for injuries sustained by the negligent running of the engines, or handling of the appliances in practice upon the streets. Whether the rule of exemption should be extended so far is not involved in the present case.

Taking notice of the public duties required to be performed by the firemen, it is clear that they had no authority whatever to invite persons into the building. The act of the plaintiff's father inviting the plaintiff, if he so in fact did, to enter the second story of the house in order to see a passing procession, was entirely outside of his duty and beyond his powers; and the District of Columbia cannot be held liable for the injuries which she received, whether the firemen were negligent in failing to protect the openings in the floor, or not. *Smith* v. *Rochester, supra;* 2 Dill. Mun. Corp. secs. 968, 970, 976. Going further, and assuming as a fact, what might be inferred from the broad allegation of the declaration, namely, that the District commissioners may have authorized and permitted the general public to enter the building for the purpose of looking at processions from its second-story windows, we think that the same rule applies. The powers of the commissioners are defined and limited. They cannot erect buildings for public amusement without the authority of Congress; much less can they convert into places of public amusement buildings authorized by Congress solely for governmental purposes. Had they expressly invited the public, on the occasion in question, to enter the fire-engine house and watch the procession from its windows, they would have acted beyond their powers; and the District of Columbia would be under no greater liability for their acts than for those of the firemen.

Our conclusion is that, considering the case upon either the statement of counsel or the allegations of the declaration, or upon both taken together, the court did not err in directing the jury to return a verdict for the defendant. The judgment will therefore be affirmed, with costs. It is so ordered.　　　　*Affirmed.*

A writ of error to the Supreme Court of the United States was applied for by the appellant on March 19, 1907, and allowed the same day.