ADA PEARSON v. KANSAS CITY, Appellant.—55 S. W. (2d) 485.

Division One, December 20, 1932.

886

*George Kingsley, James R. Sullivan* and *Arthur R. Wolfe* for appellant.

*Manard & Schwimmer* and *Carroll W. Berry* for respondent.

HYDE, C.—This is an action (filed July 21, 1926) for damages for personal injuries resulting from a fall into an elevator shaft.

Respondent was a matron at Police Station No. 4 in Kansas City. This police station property was purchased by the city and the title conveyed to it through the exercise of an option to purchase in a lease made by the Kansas City Police Board. After this purchase, the city made extensive improvements there with the proceeds of a bond issue for police and municipal court purposes. It was a two-story building, the first floor of which was used entirely for police purposes, with a jail or hold-over for men prisoners and another for women prisoners, a main office, a captain's office and a booking desk. Along the south side of the booking desk was a lobby, at the west end of which a narrower corridor ran west to the officers' toilet room. On the south side of this corridor was the door to the hold-over for the women prisoners and on the north side was the elevator shaft and the janitors' closet. The elevator ran only between the first and second floors, but there was a pit, about ten feet deep, in the shaft below the first floor which could be entered from the basement. The elevator was an hydraulic type operated by pulling a cable. No operator was employed, but whoever used it operated it. On the second floor of the building was located the matron's rooms. Juvenile prisoners were taken care of there. On the second floor was also the police traffic bureau and the courtroom of the south side municipal court. There was a stairway from the first floor used by the traffic officers and those having business with the traffic bureau or in the municipal court. The elevator was principally used by the members of the police force working at Station No. 4 for convenience in going between the two floors, for taking prisoners to and from the municipal court and for taking persons, brought to the traffic bureau for violation of traffic regulations, to the booking desk.

On December 2, 1921, between three and four in the afternoon, respondent, who had been working at this station about five months, brought a girl prisoner from the Matron's rooms on the second floor to the captain's office to be interviewed by Federal officers. She used the elevator to come down to the first floor and left it there, with the shaft door open about three feet. She testified that the latch on the door was not working properly and that if it was closed it could not be opened from the outside without the use of a wire or an ice pick or some such instrument; that she had been instructed by the janitor, who showed her how to operate the elevator, to always leave it open for this reason; and there was also testimony that orders to that effect had been posted on the station bulletin board. When she returned from the captain's office to the elevator with the prisoner, the door was open just as she had left it. She said she looked toward the shaft, thought she saw the elevator there, stepped into the door and fell into the pit. Whether someone else had taken the elevator to the second floor or whether it went up because of

leaky pressure (which it was shown had happened) was unknown.

Respondent's evidence was that it was a dark, gloomy day and that it was like twilight in the hall, so that objects could not be seen distinctly, but appeared deceptively. There was an electric light in the top of the elevator but either the globe had burned out or it was not turned on that day. There was an electric light over the booking desk about twenty feet from the elevator door with a shade which concentrated the light upon the desk. There were other electric lights in the ceiling of the hallway leading up to the elevator shaft but they were not turned on at that time, it being the custom not to turn them on in the daytime in order to keep down expenses. There was a window in the toilet room at the west end of the hall and the door to that room had a glass in it. There were also two small high windows across the lobby from the booking desk.

Respondent's petition charged negligence as follows:

"Said elevator and the entrance to said elevator shaft upon the first or ground floor of said building, at the time of said leasing and from said time thereafter until after the infliction of the injuries hereinafter complained of, was negligently permitted to be and remain out of proper repair in this, to-wit: That the machinery operating said elevator was so badly out of repair that the cage of said elevator, without the presence of an operator, would at times automatically climb or creep up said elevator shaft, and that although said elevator cage was fitted so that a light might be maintained in the ceiling thereof, such light was broken and out of repair, so that no light was maintained therein, and the catch or lock upon the door of said elevator shaft upon the first or ground floor of said building was and remained out of repair, . . . the said defendants, their agents, servants and employees negligently allowed the said elevator to be, continue and remain so out of repair and without inspection or proper inspection and negligently caused and permitted the hallway of the said first or ground floor of said building off of which said elevator shaft opened to be and remain dark and shadowy at all times save when electrically lighted and though at all times herein mentioned said hallway was equipped with electric lighting equipment said lights were at said times negligently ordered turned off and kept so by defendants, their agents, servants and employees, and were negligently turned off at said time."

And further charged:

"That said hereinafter set forth injuries were received as the result of the negligence aforesaid of said defendants in failing to furnish her a reasonably safe place to work and in requiring her to use a defective and unsafe appliance; that defendants negligently ordered and directed plaintiff to use said dark and shadowy hallway and said defective elevator in the performance of her work and directed said door thereto to be left open at the said first or ground

floor and assured plaintiff that she could safely so use said premises and elevator in the performance of her work; that the condition of said elevator and door and hallway was known to defendants, their agents, servants and employees or could have been known to them, by the exercise of ordinary care, in time for them to have warned the plaintiff or to have remedied or repaired the same or to have instructed plaintiff to close the door of said elevator at said floor after her use of same, but this they failed to do.''

Respondent had sufficient evidence to sustain these charges to warrant their submission to the jury if the city was liable under the facts for the result of such negligent acts or omissions. The trial court sustained a demurrer to the evidence on behalf of the members of the police board, who were personally sued, but overruled the city's demurrer to the evidence. The city stood on its demurrer and the jury found a verdict in favor of respondent for $18,000. Respondent thereafter remitted $8,000 and judgment was entered against the city for $10,000. From this judgment the city appealed.

■ On behalf of the city, it is urged that there is no liability for plaintiff's injuries because the maintenance and operation of the police station and the elevator therein was in the exercise of its governmental duties and functions; and further, that the police board, which was in charge of and operating the police station and elevator, was a state agency for whose acts the city was not liable. Respondent does not contend that the city would be liable for injuries sustained by reason of negligence in the performance of a governmental function nor that the maintenance and operation of the police station and the elevator therein was not a governmental function, but says:

"That under the existing proof and circumstances in the case, as shown by the evidence, a nuisance had been created and had been allowed to exist and be maintained on the city's property, as a result of which plaintiff had been injured and that for the creation, existence and maintenance of such a nuisance, the city was liable.''

It will not, therefore, be necessary to discuss the authorities cited by the city holding that the maintenance of buildings for police or fire departments, courts and other such purposes are in the exercise of the governmental functions of the city and that it is not liable for injuries caused by defects, due to negligence, in such buildings or appliances used therein or by the negligent operation therof. [See, Murtaugh v. St. Louis, 44 Mo. 479; Cunningham v. St. Louis, 96 Mo. 53, 8 S. W. 787; Ulrich v. St. Louis, 112 Mo. 138, 20 S. W. 466; Zummo v. Kansas City, 285 Mo. 222, 225 S. W. 934; Cochran v. Wilson, 287 Mo. 210, 229 S. W. 1052; Dick v. Board of Education, 238 S. W. 1073; Krueger v. Board of Education, 310 Mo. 248, 274 S. W. 814; Connelly v. Sedalia, 2 S. W. (2d) 632; McKenna v. St. Louis, 6 Mo. App. 320, 1. c. 321; Bullin v. Moberly, 131 Mo. App.

172; Barree v. Cape Girardeau, 132 Mo. App. 182; Stater v. Joplin, 189 Mo. App. 383, 176 S. W. 241; Hawkins v. City of Springfield, 194 Mo. App. 151, 186 S. W. 576; Russell v. Devon, 2 T. R. 667, 100 Eng. Reprint 359, 1 Revised Rep. 585, 12 Eng. Rul. Cas. 694; Miller v. City of Macon, 152 Ga. 648, 110 S. W. 873; Scott v. City of Indianapolis, 75 Ind. App. 387, 130 N. E. 658; Schwalk, Admr. v. City of Louisville, 135 Ky. 570, 122 S. W. 860, 25 L. R. A. (N. S.) 88; Howard v. City of New Orleans, 159 La. 443, 105 So. 443; Snider v. City of St. Paul, 51 Minn. 466, 53 N. W. 763, 18 L. R. A. 151; Nicholson v. Detroit, 129 Mich. 246, 249, 88 N. W. 695, 56 L. R. A. 601; Wilcox v. City of Rochester, 190 N. Y. 137, 82 N. E. 1119, 17 L. R. A. (N. S.) 741, 13 Ann. Cas. 759; 19 R. C. L. 1123; 43 C. J. 1167, sec. 1932; McQuillin's Municipal Corporations (2 Ed.) sec. 2793; see, also, Richardson v. City of Hannibal, 330 Mo. 398, 50 S. W. (2d) 648 (recent Missouri Supreme Court en banc)].

■ ■ Upon the question raised by respondent, namely, the extent of the liability of a municipality for injuries caused by the maintenance of a nuisance on the city's property, there is much confusion among the decisions. The general rule is stated in 43 Corpus Juris, 1734, as follows:

"Where a municipal corporation creates or permits a nuisance by nonfeasance or misfeasance it is guilty of tort, and like a private corporation or individual, and to the same extent, is liable for damages in a civil action to any person suffering special injury therefrom, irrespective of the question of negligence; and such liability cannot be avoided on the ground that the municipality was exercising governmental powers."

However, there seems to be a distinction made in the authorities between a condition, which constitutes a nuisance, resulting in damages to adjoining property and one resulting in personal injuries. This is stated in 19 Ruling Case Law, 1122, section 401:

"When a piece of real estate belonging to a municipal corporation is allowed to fall into such condition as to constitute a nuisance to adjoining property, the corporation is held liable to the same extent as a private owner, but the exemption of municipal corporations from liability for personal injury in connection with the conduct of public and governmental functions has been held to extend to injuries arising from the unsafe and defective condition of public buildings and other public places used in connection with such functions, as fully as to those resulting from the negligent acts of employees."

The extent of this liability and a reason for a distinction is also stated in 19 Ruling Case Law 1084, section 371:

"A municipal corporation as an owner of land owes the same obligations to the owners of neighboring land with respect to the use of its own, except so far as it has specific authority from the

legislature to the contrary, as that of any private owner of land, and it is accordingly well settled that if a municipal corporation makes such use of its own land as to constitute a private nuisance at common law it is liable to the owner of land specially injured by such nuisance, without regard to the character of the use which the municipality is making or whether it is engaged in a governmental or private function. The reason underlying this rule, which seems to throw greater protection over real estate than over personal safety, although it has seldom been expressed by the courts, is doubtless not so much the sanctity of private rights in real estate as that the permanent use of real estate owned by a municipal corporation is a matter within the control and observation of the governing body of the corporation, and not merely of the subordinate officials in charge of the particular piece of property, so that a creation of a nuisance may fairly be called the act of the corporation itself, whereas the defective condition of public property by reason of which an individual suffers personal injuries is usually due to the negligence of an individual caretaker, for which the municipality may not be liable.''

This view of municipal liability seems to be taken by the Court of Appeals of the District of Columbia, upon the decisions of which respondent relies. See Roth v. District of Columbia, 16 App. D. C. 323; Palmer v. District of Columbia, 26 App. D. C. 31, 1 L. R. A. (N. S.) 878; District of Columbia v. Totten, 55 App. D. C. 312, 5 Fed. (2d) 374, in which damages were allowed for injury to property in the neighborhood, from a condition permitted to exist upon public property, even though it was used in connection with governmental functions; and see Brown v. District of Columbia, 29 App. D. C. 273, 25 L. R. A. (N. S.) 98, in which recovery was denied for personal injuries resulting from falling through an unguarded hole in a fire department station; see, also, District of Columbia v. Tyrrell, 41 App. D. C. 463; (injury from defective gas pipes distinguished from Roth case, supra); Coates v. District of Columbia, 42 App. D. C. 194; Jones v. District of Columbia, 51 App. D. C. 319, 279 Fed. 188, all of which apply the doctrine of governmental function in cases involving negligence.

Coming to cases specifically involving elevator accidents it is stated in 43 Corpus Juris, 1167, section 1930:

''The maintenance and operation of an elevator in a court house, city hall or other building used for governmental purposes, is the exercise of a public, governmental function, and hence the municipality is not liable for injuries *due to the negligent maintenance and operation of the elevator*.''

Cases are cited from a number of states supporting this statement. [See, especially, Wilcox v. City of Rochester (N. Y.), 82 N. E. 1119, 13 Ann. Cas. 759, and note, 17 L. R. A. (N. S.) 741, and

note.] The only contrary authority cited is in Pennsylvania. There, no question of governmental function was considered, the defense being that the city hall, in which an elevator was used in carrying the public to the courts, operated by an employee paid by the city, was under the control of a state commission. The court held that, although the building was built by the state commission, it had been turned over to the city which was in control at the time of the accident and held the city liable for its employees' negligence. [Fox v. Philadelphia (Pa.), 57 Atl. 356, 65 L. R. A. 214.]

In a recent annotation, 75 American Law Reports, 1196, the authorities on both sides, of the question of a city's liability for personal injuries resulting from the maintenance of a nuisance, are exhaustively reviewed. It is, perhaps, true that some cases do not clearly distinguish between a nuisance and negligence. It will be also found upon an examination of them, that many of these authorities, holding a municipality liable for damages for personal injuries resulting from maintaining a nuisance, are cases where the nuisance created a condition which impaired the safety of public streets. Under its duty to keep its streets reasonably safe, this court held a city liable for negligence in leaving open a door in a sidewalk which led to the basement of a police station. [Carrington v. St. Louis, 89 Mo. 208, 1 S. W. 240.] Improving and maintaining streets is generally held to be an exercise of the private functions of a municipality, for negligence in the performance of which it is liable, rather than its governmental functions. [19 R. C. L. 1111, sec. 392; 43 C. J. 976, sec. 1755.] In a recent case, this court imposed liability upon a city for damages to adjoining property from a nuisance resulting from a sewer outlet, but said that the city was not exercising a governmental function. [Windle v. City of Springfield, 320 Mo. 459, 8 S. W. (2d) 61.]

What should be the proper rule, in cases involving liability of a municipality for personal injuries caused from maintaining a nuisance upon city property used for governmental purposes, is not, however, the decisive question here, because respondent, both by her pleading and evidence, makes a case of negligence in the maintenance of the elevator rather than a case of maintaining a nuisance. Negligence is the failure to exercise the degree of care required by the circumstances. [20 R. C. L. 9, sec. 7; 45 C. J. 628, sec. 1; Bouvier's Law Dict.; Pope's Legal Definitions; Rapalje and Lawrence's Law Dict.] A nuisance does not rest *on the degree of care used, but on the degree of danger existing* with the best of care. [20 R. C. L. 381, sec. 3; see, also, 45 C. J. 634, sec. 9; 46 C. J. 663, sec. 28; Joyce on Law of Nuisances, 28, sec. 18.] In Schnitzer v. Excelsior Powder Mfg. Co. (Mo. App.), 160 S. W. 282, l. c. 284, the court said:

"Nuisance and negligence are different kinds of torts, not only in legal classification but in their essential features. Negligence is

not a necessary ingredient of the wrong of maintaining a nuisance, and, given the fact that a nuisance was maintained, the question of whether the wrongdoer was careful or negligent in the manner of its maintenance is wholly immaterial.''

There the petition alleged a nuisance but there was evidence of negligence. The court further said:

''Should we find that her evidence fails to show the proximate cause was a nuisance as alleged, she cannot recover in this action, though we should find her evidence convicts defendant of negligence that was the proximate cause of her injury.''

■ The converse of that proposition would apply here, that is: Respondent having based her petition upon negligence (failure to furnish safe place to work and safe appliances with which to work) could not recover on the theory of nuisance. Certainly respondent could not recover upon that theory when it is neither pleaded nor shown by the evidence. [Gandy v. St. Louis-San Francisco Ry. Co., 44 S. W. (2d) 634, and cases cited l. c. 637; Prentiss v. Illinois Life Ins. Co., 225 S. W. 695, and cases cited l. c. 701.]

■ It is, of course, possible for the same act or omission to ''constitute negligence and also give rise to a nuisance.'' [45 C. J. 639, sec. 9; see, also, Schindler v. Standard Oil Co., 207 Mo. App. 190, 232 S. W. 735; Shelley v. Ozark Pipe Line Corp., 327 Mo. 238, 37 S. W. (2d) 518.] There must, however, be a degree of danger (likely to result in damage) inherent in the thing itself, beyond that arising from mere failure to exercise ordinary care in its use before the question of a nuisance can properly be submitted to a jury. ''The question as to what constitutes a nuisance is one of law for the court; but it is for the jury to decide whether a particular act or structure or use of property, which is not a nuisance *per se*, is a nuisance in fact.'' [46 C. J. 812, sec. 469.] Of course, this condition of inherent or intrinsic danger may arise either from original improper construction of a structure or from such a deterioration thereof from neglect as to warrant the conclusion that an inherently dangerous condition is intentionally permitted to exist. As said in one case, (where the wall of a building collapsed), Herman v. City of Buffalo (N. Y.), 108 N. E. 451, l. c. 453:

''This is not declaring that it must have intended the danger or the catastrophe. It must have intended the condition, but, having that intention, may have thought it was not dangerous or have been thoughtless in regard to it. It must have violated the absolute duty of refraining from the participating acts, not merely the relative duty of exercising reasonable care, foresight, and prudence in their performance. The wrongfulness must have been in the acts themselves, rather than in the failure to use the requisite degree of care in doing them, and therein lies the distinction, under the facts of

this case, between 'nuisance' and 'negligence.' The one is a violation of an absolute duty; the other a failure to use the degree of care required in particular circumstances—a violation of a relative duty." [See, also, Pope v. New Haven (Conn.), 99 Atl. 51.]

In a recent Connecticut case, Hoffman v. City of Bristol (Conn.), 155 Atl. 499, 75 A. L. R. 1191, a municipality was held liable, upon the theory that it was maintaining a nuisance although exercising a governmental function, where it built and maintained a diving board at a public beach above shallow water, the court citing Herman v. City of Buffalo, supra, in showing "the distinction between nuisance to which governmental immunity does not attach and mere negligence as to which is available." According this distinction, it seems obvious that had the diving board been built and maintained at a proper place but, because of the failure of the city officials to use due care, got out of order or some obstruction got into the water below it, the city would not have been held liable for resulting injuries because an action then would have necessarily been based upon negligence. Viewing plaintiff's petition in the light of these principles, it is clear that it pleaded a case of injury through negligence and not a case of injury by reason of maintaining a nuisance. It is also clear that such was the case made by respondent's evidence, which neither showed any defects inherent in the construction of the elevator, (see McDonnell v. Gerken, 189 N. Y. Supp. 224, affirmed, 142 N. E. 307), nor a condition which had become so inherently dangerous as to create any substantial degree of danger if ordinary care was exercised.

Respondent's evidence tended to show three conditions contributing to her injuries which clearly were not inherently dangerous (because easily prevented by the exercise of ordinary care) but which were all permitted to exist at the same time on the date of respondent's accident by reason of failure to exercise such care and become the cause of her injuries.

First: That the elevator main staff was worn so that it would leak pressure and force the elevator up from the first floor when it was left there. It was shown by respondent's evidence that this could be remedied by repacking the staff and that such repacking would prevent the elevator from so leaking pressure and moving up for a period of at least a month or six weeks; that the police board had a regular elevator inspector or repair man who did the repacking upon notification; and that during all of the remaining three years respondent worked at Station No. 4 after her fall it was kept in condition in this manner. It seems from the evidence that all hydraulic elevators require occasional repacking and other attention. Furthermore, that even though the elevator did move up from the first floor this condition would not have been inherently dan-

gerous to persons in the station if the shaft door was kept closed and proper electric lights were on.

Second: That the latch of the shaft door was worn so that when it latched the handle on the outside would not release it. Apparently the remedy for this was the comparatively simple operation of putting on a new latch or some part thereof and it was shown that this was done after the accident. Since the trouble with the door was not that it would not close, but rather that it was inconvenient to open when it had been closed, it was not the condition of the latch which made the elevator shaft dangerous, but, instead, it was the negligent order to leave the door open for mere convenience.

Third: That the hallway was dark so that one could not see at four o'clock in the afternoon on a dark and gloomy day whether or not the elevator was at the shaft entrance and, further, that the light globe in the top of the elevator had gone dead. The remedy for this condition was much simpler than for the first two. It was only necessary to take out the old light bulb and put in a new one in order to have a light in the elevator which would show whether or not it was at the door, and it was only necessary to press a button or turn a switch to have sufficient light in the hall for anyone to see if it was there, whether there was any light in it or not. It also seems that when the sun was shining brightly even this was not necessary.

Therefore, the case on respondent's showing resolves itself to this: Due care was not used in repacking the elevator staff well enough, often enough, or soon enough after the last preceding repacking; due care was not used in replacing the worn part of the latch so that the shaft door could have been kept closed without inconvenience, (had both of these been corrected, still might not respondent, approaching in the deceptive twilight of the hall if someone else had taken the elevator up, have thought she saw it where she left it, opened the door and stepped into the pit?), or due care was not used in giving orders not to close the door; and due care was not used in failing to turn on the lights in the hallway when it was too dark to see clearly without them. It would seem that had this last precaution been taken that regardless of the other defects the accident would not have happened. It would therefore seem that the principal moving cause of the accident, although the other defects may have contributed, was the failure to turn on the hall lights, or, to put it another way, the care required under the circumstances, to prevent a condition which might cause an accident on that afternoon, was turning on the hall lights. It would therefore seem obvious that the accident was caused by failure to use the proper degree of care and not by an inherently dangerous condition which would cause damage regardless of the exercise of a reasonable degree of care.

■ There is also another feature of this case which distinguishes it from any of the other cases referred to herein. That is: The police station and the elevator therein was entirely under the control of the police board, which was a state agency. [State ex rel. Field v. Smith, 329 Mo. 1019, 49 S. W. (2d) 74; American Fire Alarm Co. v. Board of Police Commissioners, 285 Mo. 581, 227 S. W. 114.] A municipal corporation has no inherent police power but derives it solely from delegation by the State. [19 R. C. L. 800, sec. 108; 43 C. J. 205, sec. 204.] "The protection of life, liberty and property and the preservation of public peace and order in every part, division and subdivision of the State is a governmental duty which devolves upon the State and not upon its municipalities any farther than the State in its sovereignty may see fit to impose or delegate it to the municipalities. [State ex rel. Hawes v. Mason, 153 Mo. 23, 1. c. 43, 54 S. W. 524; see, also, State ex rel. Reynolds v. Jost, 265 Mo. 51, 175 S. W. 591; Strother v. Kansas City, 283 Mo. 283, 223 S. W. 419; State ex rel. Board of Police Commissioners v. Beach, 325 Mo. 175, 28 S. W. (2d) 105.] In this State, the Legislature had not seen fit to delegate completely to Kansas City the function of maintaining a police department but had retained control thereof in the State by placing upon the Governor of the State the duty of appointing the police board which would have charge of such functions there. While the police board was in charge of the station, there was nothing the city could do about it. As said in 19 Ruling Case Law, 1114, section 394:

"The rights and powers of a municipality are subject to the will and control of the legislature, and it lies within the power of the legislature to take the control of some municipal department out of the hands of the municipality and turn it over to some board of state officers. When this has been done, upon rudimental principles of justice the municipality cannot be held liable for the negligence of such officers, regardless of the nature of the function which they are administering."

We see no reason why this would not apply even to a nuisance if one had been created or maintained solely by them. We, therefore, hold that there is no liability upon the city of Kansas City in the present case. The judgment is reversed. *Ferguson, C.,* concurs; *Sturgis, C.,* absent.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.