Joseph J. CIGAS and Agnes Julia Cigas, John J. Gillespie, Francis W. Barnes and Virginia T. Barnes, Thomas J. Finn and Patricia M. Finn, Appellants,

v.

KANSAS CITY LIFE INSURANCE COMPANY, Respondent.

No. 29723.

Missouri Court of Appeals, Western District.

Sept. 4, 1979.

Donald E. Raymond, Thomas M. Howell, Kansas City, for appellants; Howell, Raymond & Raymond, Kansas City, of counsel.

Reed O. Gentry and Reggie C. Giffin, Kansas City, for respondent; Field, Gentry, Benjamin & Robertson, Kansas City, of counsel.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

PRITCHARD, Judge.

In a lengthy four count first amended petition, appellants sought to charge respondent with damage liability for depressing the values of their properties lying between 33rd Street on the north, Valentine Road on the south, Southwest Trafficway on the west, and Pennsylvania Avenue on the east, in Kansas City, Missouri, generally, and incorporated in each of appellants' four counts, that respondent devised a scheme to acquire these properties at depressed prices so that the land could be assembled for the erection of lucrative apartment and business buildings; as a part of the scheme, respondent continued through acquisition of the properties, and their subsequent neglect, to blight the area depressing appellants' property values, and to use the Missouri Urban Development Law to gain tax concessions, to force appellants to sell their homes, either by making the neighborhood so undesirable that residents would be forced to move, or by blighting the area so the city would be forced to condemn or give to respondent the right to condemn; that about 1970 respondent began acquiring properties in the area to carry out the scheme, particularly older, less cared-for homes, which it proceeded to make even more dilapidated by neglecting even minor maintenance so that the properties would become hazardous to the health and safety of persons living in the houses and neighboring properties; that respondent entered into a conspiracy with one Witthaus, a real estate broker, to assist in its scheme, and to hasten the deterioration of the neighborhood; that rentals of its properties were made by respondent to persons who would cause trash, garbage and debris to accumulate and create loud noise and otherwise disturb neighbors for the express purpose of causing deterioration of the area and making the neighborhood an unpleasant place to live; that Witthaus, at respondent's instigation, went through the area urging persons to sell their properties to respondent on advice that the neighborhood was becoming blighted and unsafe, and if they did not sell, respondent would force them to do so by condemning their properties; that respondent applied to the City of Kansas City to have the area designated blighted saying that it was unsanitary, crime-ridden, and deteriorated to such an extent that to protect the city, all of the homes and businesses therein would have to be torn down and utterly destroyed so that respondent would forcibly acquire the properties against appellants' wishes and for its own profit; that the application for "Urban Redevelopment" was not filed in good faith by respondent, by reason whereof the area gained the reputation throughout the city as being undesirable to such an extent as to destroy the marketability of properties therein; that because of total lack of merit, and by reason of the fact that the area was not blighted, respondent's application (for urban redevelopment) was unanimously rejected by the city at a public hearing held April 1, 1971, but notwithstanding that rejection, respondent continued its scheme of acquiring property and deteriorating the entire area by permitting and encouraging

the removal of fixtures and equipment from vacant houses, by tearing down houses leaving vacant spaces, and by encouraging use and abuse of properties by its tenants to an extent detrimental to the entire neighborhood, and to appellants' properties. Count V of the petition, which was for an injunction, was dismissed by appellants without prejudice toward the end of the trial.

At the close of appellants' evidence, the court sustained respondent's motion for directed verdict. The issue is thus whether appellants produced sufficient evidence to make a submissible case upon any of their pleaded grounds for relief, and of course, the evidence must be here considered in its light most favorable to appellants. *Boyle v. Colonial Life Ins. Co. of America*, 525 S.W.2d 811, 815[6] (Mo.App. 1975), and cases cited.

Appellant Thomas J. Finn testified that he acquired his house at 3620 Jefferson in 1962 for $8,000. He bought the adjoining house, a rental property, at 3622 Jefferson, in 1954, for $11,000, lived in it for awhile, then used it since as tenant property. Adjoining the properties on the north is a house acquired in 1969 by respondent, according to an exhibit, at 3616 Jefferson, which first rented. Finn testified that the property thereafter ran down and it was demolished in 1973, thereafter being a vacant lot. Of six properties owned by respondent in Finn's block, only one, 3616 Jefferson, has been torn down as of the date of trial, at which time also Finn testified the house he lived in was worth $30,000.

Appellant Joseph J. Cigas purchased his property at 3541 Jefferson in 1960. A key map of the area, identified by him, shows properties owned by respondent colored in yellow and red markings to indicate buildings that were torn down. Cigas carried mail in the area and noticed properties changing hands about 1968, and he observed a building at 3320 Pennsylvania which he noticed thereafter deteriorated in maintenance. So also with a building at 3605 Pennsylvania, and other buildings acquired by respondent in 1969. On April 1, 1971, a hearing was had on the application of Penn Valley Redevelopment Corporation to declare the Valentine area blighted, but the application was rejected by the City Planning Commission, after which a representative of respondent stated on a television interview that it did not consider the project defeated but that it was "going to continue acquiring properties and go from there." Cigas learned "first hand" then that respondent was trying to buy more properties. An exhibit, respondent's acquisition data, shows that it in fact greatly increased its purchases in the area after July, 1971, through May, 1976. Cigas further testified that many of respondent's properties were thereafter in a state of bad repair and deterioration. Some corrections to properties were effected by respondent after building code enforcement was instigated.

Apparently, up to May 20, 1976, 31 buildings in the area owned by respondent were demolished, Cigas having learned prior to any demolition that respondent intended to do it. Up to that same date, respondent had acquired a total of about 87 properties in the area north of Valentine Road. A count of the remaining properties on the Key Map indicates about 84 of them were owned by individuals. The properties in the area were substantially constructed about the turn of the century.

T. Paul Dwyer, a consulting engineer, testified for appellants that in his practice, he makes studies of buildings, structures and areas to determine the existence of blight. He examined about 27 properties in the Valentine area owned by respondent stating variously the maintenance repairs needed by each, an average cost of about $200.00 each. Other properties in the area did not need the extensive repairs as these—they were in better condition, more painted and repaired. He read the redevelopment ordinance Section 36.2 of the City of Kansas City in evidence, including its definition of Blighted Areas: " 'Blighted Area' shall mean those portions of the city which the council shall determine, that by

reason of age, obsolescence, inadequate or outmoded design or physical deterioration, have become economic and social liabilities and that the conditions in such localities are conducive to ill health, transmission of disease, crime or inability to pay reasonable taxes." On further direct examination, Dwyer testified that he found no conditions of obsolescence and inadequate or outmoded design and physical deterioration; no conditions of the property that would be conducive to ill health; or that would cause the transmission of disease. On cross-examination, he acknowledged that in his review of respondent's properties, they were not particularly substandard, "in that they were liveable."

■ Respondent quite apparently organized the Penn Valley Redevelopment Corporation, its officers being also those of the redevelopment corporation. This was done, also quite apparently, for the purpose of having the city declare the Valentine area blighted so that it could be condemned and redeveloped as an urban area. Appellants charge respondent with bad faith in initiating these urban redevelopment proceedings. No bad faith appears anywhere in the record, nor is there any evidence of any conspiracy between respondent and others (Witthaus as alleged) to bring about blight for respondent's purposes. Chapter 353, RSMo 1978, authorizes the formation of corporations such as Penn Valley, which also thereunder, as authorized by ordinance, have the power of eminent domain over "blighted areas." [§ 353.130 2] Respondent's acts, or those done by Penn Valley, were in accordance with the statutes. As noted in *Payne v. Kansas City, St. J. & C. B. R. Co.*, 112 Mo. 6, 20 S.W. 322, 324 (1892), "It is generally held that acts done by virtue of statute law, which do not directly encroach upon the property of an individual, or disturb him in his possession or enjoyment, will not entitle him to compensation or give him a right of action. (Citing authority and cases.)" Here, the respondent, through Penn Valley, presented to the city merely its petition to have the Valentine area declared blighted for purposes of redevelopment. It failed in that attempt. No

property right of appellants was then encroached upon, the denial of the petition merely cutting off further proceedings for urban redevelopment, including that of an exercise of the right of eminent domain granted to Urban Redevelopment Corporations under Chapter 353, and Chapter 99 [RSMo § 99.460, 1978] to a Redevelopment Authority. No significance can be attached to Penn Valley's failure to convince the city that the Valentine area should be redeveloped, nor to respondent's thereafter announced intention privately to acquire and redevelop the area. As a corporation, respondent has the general power and authority to purchase, hold and use real property for its legitimate corporate purposes. Const.Mo.1945, Art. XI, § 5.

The evidence does show that respondent did acquire numerous properties in the Valentine area. There is no evidence, even by way of inference as appellants argue, that respondent by its purchases intended to create blight in the area, or intended by its purchases to depress property values in the area. Some of appellants' testimony indicated that there were inadequacies of repair on respondent's properties after it acquired them, such as peeling paint, loose and torn screens, loose or broken porch railings and entrance steps, old furniture (presumably a tenant's) on one porch, and old radiators on another, guttering broken or disconnected, eaves deteriorating and boards hanging down. Appellants Finn and Cigas did not testify as to when or how long these conditions existed, but apparently they were corrected after complaint was made to the housing code enforcement department. Significantly, appellants' witness, Dwyer, who examined the area in detail, testified that he found no conditions of obsolescence, inadequate or outmoded design, physical deterioration, conditions conducive to ill health or transmission of disease. He found, as he acknowledged, minor items of needed repair, an average of slightly over $200.00 cost per house, and he found none to be particularly substandard. No evidence was adduced by appellants to show that use of any property by respondent

constituted a nuisance so as substantially to impair the rights of others in the neighborhood peacefully to enjoy their properties. See *City of Fredericktown v. Osborn*, 429 S.W.2d 17, 22[2–7] (Mo.App.1968), for a statement of the law of nuisance and factual criteria necessary for the establishment of same, none of which here exists. See also *Pearson v. Kansas City*, 331 Mo. 885, 55 S.W.2d 485, 489[1, 2] (1932); and *Rodgers v. Kansas City*, 327 S.W.2d 478, 482[2] (Mo. App.1959).

The evidence indicates that many houses in the Valentine area were constructed about the turn of the century. Respondent had razed or demolished about 31 of them as noted. Appellants contend that the demolition was done for the purpose of decreasing property values in the area, and to acquire the rest of the property. They say that after the Urban Redevelopment application was rejected respondent continued purchasing area properties and removing improvements so as to scatter vacant lots throughout the neighborhood. Although Mr. Margolin testified that respondent's signs were on the vacant lots indicating its ownership, there is no evidence that it erected the signs for the purpose of discouraging others from purchasing properties as stated in appellants' brief. What is determinative of this contention is an application of the general rule, "The constitutional right of property includes its use. Every person is entitled to make a reasonable use of his own property. The general principle expressed in the Latin maxim 'sic utere tuo ut alienum non laedas'—that every person may make such use as he will of his own property, provided he uses it in such a manner as not to injure others—is fully applicable to adjoining landowners and to a large extent governs in determining the rights, duties, and liabilities in respect of each other. Under this maxim a property owner may put his property to any reasonable and lawful use, so long as he does not thereby deprive the adjoining owner of any right of enjoyment of his property which is recognized and protected by law, and so long as his use does not amount to a nuisance in law. The maxim applies only to results which extend beyond the limit of the owner's property. It is not to be inferred that the law forbids any and all uses of property which may cause loss, damage, or inconvenience to others. Therefore, while the rightful use of one's own land may sometimes diminish the value of an adjoining estate, or prevent its being used with the comfort which might otherwise have been anticipated, this is damnum absque injuria, as to which the law cannot interfere. Damages are not recoverable for mere incidental inconvenience to an abutting property owner or an injury consequential in its nature or one that is remote or far removed and such as is suffered by the community at large. * * * Thus, an owner is exonerated from liability for injuries to an adjoining owner where he makes a 'reasonable use' of his property. If the use satisfies the test of reasonableness, any incidental detriment to an adjoining owner is damnum absque injuria." 1 Am.Jur.2d, Adjoining Landowners, § 2, p. 692. As to what constitutes reasonable use, it is said further at 1 Am.Jur.2d, § 3, Adjoining Landowners, p. 693: "The inquiry is: Was the act or use a reasonable exercise of the dominion which the owner of property has by virtue of his ownership over his property, having regard to all interests affected, his own and those of his neighbors, and having public policy in view also."

Illustrative of the foregoing principles are these cases: *Jenkins v. Louisville Home Telephone Co.*, 120 S.W. 276 (Ky.App.1909), where the telephone company was held not liable for erecting a pole on its property near a window on plaintiff's adjoining property through which a burglar gained entrance to her home; *Pennsylvania Co. for Insurance, etc. v. Sun Co.*, 290 Pa. 404, 138 A. 909 (1927), where oil tanks were erected on defendant's property, a nuisance not being alleged, and a demurrer to the complaint was sustained. The court said, at 138 A. page 910[2–5], "An owner has a right, barring malice and negligence, to any use of his property, unless by its continuous use he prevents his neighbors from enjoying the use of their property to their damage"; and

*Harper v. Standard Oil Co.*, 78 Mo.App. 338 (1899), a suit for damages for maintenance by defendant of a gasoline tank and six coal oil tanks on its property adjacent to plaintiff's rental residential property, a demurrer being sustained to the evidence, the court saying, "It [defendant] had the absolute right to the reasonable use of its own property."

Appellants rely upon *Eyerman v. Mercantile Trust Co., N.A.*, 524 S.W.2d 210 (Mo. App.1975). That case had facts far different than here for which it is distinguishable. There, the testatrix directed that her home at 4 Kingsbury Place, "an area of high architectural significance", be razed, the lot sold, and the proceeds transferred to her residuary estate, said in the majority opinion to be without purpose; there would have been a large unwarranted loss to the estate occasioned by demolition; the area was designated as a landmark of the city; it was in a "private place concept" important in stabilizing the community; and public policy did not permit testatrix's "caprice" to produce a senseless destruction. None of these considerations are here present, and no wrongful demolition or any other wrongful use was established by appellants' evidence.

Appellants contend that respondent permitted the area to become blighted and to decline by its permitting its tenants to accumulate trash and debris on its property. Objections to some of this evidence were sustained, but the conditions of some rental houses came into evidence. Appellants' counsel, however, acknowledged during trial that no notice was given to respondent as to any specific conduct of any named tenant. There was no evidence at all that any tenant's act was procured by respondent or that it had any knowledge of any such act. If there was any situation of nuisance created by tenants, respondent was not shown to be responsible therefor. See *Bellflower v. Pennise*, 548 F.2d 776 (C.A. 8th 1977); *Kelly v. Laclede Real Estate and Investment Co.*, 348 Mo. 407, 155 S.W.2d 90 (1941); and *Shippey v. Kansas City*, 254 Mo. 1, 162 S.W. 137 (1913), where the owner was not held liable for his tenant's signboard falling on plaintiff because he had relinquished position to the tenant.

Because appellants did not make a submissible case on any pleaded theory of recovery, the trial court did not err in directing a verdict against them. It is thus not necessary to consider the further contention that the trial court erred in excluding testimony of appellants' expert witness as to damages.

The judgment is affirmed.

All concur.